Belknap
No. 2005-444

THE STATE OF NEW HAMPSHIRE

v.

STEPHEN J. GOUPIL

Argued: July 20, 2006
Opinion Issued: September 28, 2006

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Sisti Law Offices*, of Chichester (*Mark L. Sisti* on the brief and orally), for the defendant.

GALWAY, J. The defendant, Stephen J. Goupil, was convicted in Superior Court (*Smukler*, J.) of five counts of aggravated felonious sexual assault, *see* RSA 632-A:2, I(c) (Supp. 2005), and one count of theft by unauthorized taking, *see* RSA 637:3 (1996). The defendant appeals the denial of his pretrial motions to suppress, the admission of photographic evidence and

exclusion of demonstration evidence at trial, the denial of his motions to dismiss and for directed verdict, and the denial of his motions to set aside the verdict based upon alleged juror misconduct. We affirm.

The jury could have found the following relevant facts. At the time of the incident, the victim lived in a first-floor apartment in Laconia. In the early morning of April 23, 2004, two men broke into her apartment and entered her bedroom. They repeatedly punched her in her face, head, neck and back. The victim was screaming and attempting to defend herself when one of the men placed a knife to her neck and said, "[S]hut up, stop screaming or ... you're going to f---ing die." The men continued to threaten the victim and she stopped screaming. They blindfolded and gagged her, and then searched her apartment. The first assailant, the man with the knife, then straddled her while she lay on the bed and began to ask personal questions about her sexual past. He removed her clothing and forced her into the shower. The victim, who was still blindfolded, could see that the first assailant was Caucasian. He then removed his own clothes and got into the shower, where he fondled her vagina.

The victim and the first assailant returned to the bedroom where she complied with his order to lie down on the bed. The assailant told her to remain quiet and keep her eyes closed, after which he removed the blindfold. The victim testified that she was still in shock and "didn't know what was going to happen. I still didn't know if I was going to get cut with the knife, I still didn't know if I was going to live or die. The one thought I know I had, I remembered in the back of my mind I wanted to keep myself alive and just try to survive this ordeal."

The first assailant then sexually assaulted the victim. While he was on top of her, she opened her eyes and saw a "red and black tribal looking tattoo" on his left upper arm. Once the first assailant stopped sexually assaulting the victim, he ordered her to have sex with "Corey," the second assailant. After Corey sexually assaulted her, the first assailant said, "[A]lright, we're done now." He then ordered the victim to turn around and look at the wall. When she complied, she noticed that the second assailant was standing in the doorway holding a knife and pointing it at her.

Later, the first assailant asked the victim where her car keys were and she told him. He then blindfolded her, picked up her cordless phone, and told her to not get up or say anything for five minutes to give them time to leave. After she heard the assailants begin to drive away, she looked out the window and watched them drive down the street in her car.

The victim ran to a neighbor's apartment for help; the neighbor called 911. An ambulance took the victim to Lakes Region General Hospital, where evidence was collected using a sexual assault kit, and she was

treated and released. The victim then gave a detailed tape-recorded statement to Detective Jeffrey Stiegler at the Laconia police station. During that interview, she stated that she recalled seeing a tattoo on the left bicep of the smaller of the two assailants that was red and black and looked like a tribal design. She also stated that the two assailants were white, and that the first assailant had a tattoo, was shorter than the other, was the leader, and did most of the talking. These were the only identifying statements the victim made with regard to her assailants.

Later that morning, Detective Sergeant William Clary began to investigate the home invasion and sexual assaults. Based upon information developed during the investigation, he, Stiegler and another Belmont police officer went to interview the defendant at his grandmother's house in Belmont. The defendant's grandmother answered the door and the officers identified themselves and asked to speak with the defendant. She let the officers into the house, told them that the defendant was sleeping and went to wake him.

When the defendant entered the kitchen, Clary noticed that the defendant had a red and black tattoo on his shoulder. Clary, Stiegler and the defendant were seated at the kitchen table while the other police officer and the grandmother were standing in the kitchen. The officers asked the defendant if he would speak with them and he agreed. They explained that they were investigating a burglary, sexual assault and theft of a motor vehicle that had occurred in Laconia. During the conversation, the defendant stated that he had been with his cousin, Douglas Jenot, that morning but was unable to account for his whereabouts between 1:30 a.m. and approximately 6:30 a.m. The officers asked the defendant if they could take a photograph of his tattoo and if he would give them a hair sample; he consented to both. However, he refused the officers' request to obtain a DNA sample by swabbing the inside of his mouth. When it became clear that the defendant would give the officers no further information, they terminated the interview, which did not exceed fifteen minutes.

On April 27, the victim again met with Stiegler. Stiegler showed her the photograph of the defendant's tattoo. She was not informed of, and did not know, the identity of the person whose arm and tattoo were depicted in the photograph. Nor were there any identifying markers on the photograph. The victim was asked if the tattoo was the same one she saw when she was attacked. She was unable to positively identify the tattoo. Consistent with the statement she gave to Stiegler during that meeting, the victim testified at trial that when shown the photograph of the tattoo, it looked "somewhat familiar" in that it was red and black and had a tribal design. However, she also testified that she did not remember seeing a bulldog in the tattoo on the first assailant's arm.

On May 5, Stiegler obtained a search warrant to obtain a DNA sample, in the form of a saliva swab to be taken from the defendant. The DNA in the sperm collected from the victim matched the defendant's DNA. On May 11, 2004, the defendant and Douglas Jenot were both arrested. The police officer who booked Jenot testified that Jenot had no tattoos.

The defendant was indicted on five counts of aggravated felonious sexual assault, one count of burglary, and one count of theft by unauthorized taking. Prior to trial, he moved to suppress: (1) statements that he made at his grandmother's home; (2) the photograph of the tattoo on his arm; and (3) the DNA evidence obtained from the saliva swab. After a three-day evidentiary hearing, the trial court denied the motions.

A six-day jury trial was held in March 2005. At the close of the State's case, the defendant moved to dismiss the indictments, and the court denied the motion. The defendant was convicted of five counts of aggravated felonious sexual assault and one count of theft by unauthorized taking, and acquitted of burglary.

Soon after the jury returned the verdicts, the trial court was informed that prior to jury selection, Juror 2—the jury foreman—had posted comments on a web log, or "blog," that referenced his upcoming jury duty. The court conducted a chambers conference at which the defendant moved to vacate the verdicts. Among other things, he argued that Juror 2's statements expressed bias against criminal defendants and indicated that he did not understand the presumption of innocence or the burden of proof. The court denied the motion but granted the defendant's subsequent motion to conduct individual *voir dire* of the jurors. The trial court conducted a comprehensive *voir dire* of each juror, after which the defendant again unsuccessfully moved to vacate the jury verdicts.

Shortly thereafter, Juror 2 was considered for jury duty in another criminal case. In that case, the Trial Court (*Perkins*, J.) granted defense counsel's motion to strike Juror 2 for cause. Based upon that action, the defendant again moved to set aside the jury verdict. The trial court reaffirmed its prior finding that Juror 2 had been a fair and impartial juror, and concluded that nothing in the subsequent jury selection process altered that finding.

On appeal, the defendant argues the trial court erred by: (1) denying his motions to set aside the jury verdicts based upon alleged improper conduct and partiality of Juror 2; (2) not dismissing the aggravated felonious sexual assault indictments for failure to present a *prima facie* case; (3) not directing verdicts of acquittal on the aggravated felonious sexual assault charges; (4) denying his request to stand up in the court room to display his height to the jury; (5) not suppressing statements made at his

grandmother's house; and (6) admitting evidence of a photograph depicting his tattoo.

## I. Juror Conduct

The defendant argues that Juror 2's blog contained derogatory and biased opinions regarding criminal defendants and the judicial process, and that his constitutional right to an impartial jury was violated. *See* N.H. CONST. pt. I, art. 15; U.S. CONST., amends. VI, XIV.

The blog entries at issue are as follows. Prior to jury selection, Juror 2 wrote, "Lucky me, I have Jury Duty! Like my life doesn't already have enough civic participation in it, now I get to listen to the local riff-raff try and convince me of their innocence." He also made general comments regarding his impression of the jury selection process, his desire not to serve as a juror, and his disgust at possibly being chosen as a juror for an unrelated child pornography case. Once he was seated on the defendant's jury, but prior to the start of the trial, Juror 2 wrote: "After sitting through 2 days of jury questioning, I was surprised to find that I was not booted due to any strong beliefs I had about police, God, etc." Prior to trial, Juror 2 also posted: (1) a photograph depicting a woman's deformed face after she was hit by a drunk driver; and (2) a statement containing his views on a United States Supreme Court decision ruling against the death penalty for juveniles. During the defendant's trial, Juror 2 made a blog entry that referenced an unrelated shooting incident in Atlanta.

The trial court learned of Juror 2's blog soon after the jury returned the verdicts and was released from duty. The court conducted a chambers conference at which it denied the defendant's first motion to set aside the verdicts, but ruled that further inquiry into Juror 2's blog and its impact, if any, on the remaining jurors was warranted.

The following day, the trial court conducted individual *voir dire* with each of the jurors, including the alternates. The court began with Juror 2, who acknowledged having a blog. The court then asked the following questions:

Q: Okay. And on that web log you posted, I guess it was February 9th, something to the effect of now you get to listen to the local riff raff trying to convince me of their innocence. And I recognize that that was before you were instructed. Did you understand the instructions that I gave both on a general basis when you first came in and more specifically on this case that the burden of proof is on the state to prove guilt, rather than the defendant to prove innocence?

A: I did, your Honor.

Q: Okay. Did you follow those instructions in the course of your deliberations?

A: I did, your Honor.

Q: Okay. Did your feeling before those instructions that it is the responsibility of quote, local riff raff to convince you of [their] innocence, did your feeling there in any way interfere with your ability to follow the instructions with respect to the actual burden being on the state?

A: It did not, your Honor.

Q: Okay. Your postings also indicated two other areas that I just want to ask you about. One is you mentioned in your web log certain news articles that you've been following.

First, I want to ask, during the course of this trial from the time—I know you didn't come up to the bench, but at any time did you read—up until the verdict did you read, listen or watch any press coverage of the *State v. Goupil* case?

A: I did not, your Honor.

Q: Okay. Your web log mentioned certain coverage with respect to the shootings in Atlanta and certain security concerns raised by that. Did that in any way interfere with your ability to deliberate this case based on the evidence?

A: Absolutely not, your Honor.

Q: Okay. Your web log also indicated certain reaction to the Supreme Court's opinion with respect to the death penalty for juveniles. Did that in any way have any impact on your deliberations in this case?

A: Absolutely not, your Honor.

Q: Did you raise any of these issues in terms of the context of this case with any of your colleagues on the jury?

A: Absolutely not, your Honor.

The trial court then consulted with counsel, and defense counsel requested that the court ask Juror 2 additional *voir dire* questions; the court agreed. When directly asked what his general knowledge was prior to jury selection with respect to the burden of proof in a criminal case, Juror 2 denied having any predisposition or thoughts on who had the burden of proof. The trial court then asked, "So what was the genesis of

the riff raff? Convince me of the innocence remark [*sic*]." Juror 2 answered, "Your Honor, I don't even recall making that remark and it was probably an off-hand remark. There was no real thought behind it." In response to further questions, Juror 2 stated that he understood the proper burden of proof when he deliberated as a juror on the defendant's case. He also: (1) denied being exposed to any press coverage regarding this case prior to being drawn as a juror; (2) stated that no one responded to his postings on the web log that related to his jury service on this or any other case; (3) denied receiving any responses to his blog; (4) denied being contacted by anyone trying to influence his decision as a juror; (5) stated that nothing interfered with his ability to follow the jury instructions with respect to the law of the case; and (6) stated that he was absolutely able to make a fair and impartial verdict based upon his evaluation of the evidence in the case as applied to the law given by the trial court.

During its individual *voir dire* of the remaining jurors, the trial court informed each juror that one of the jurors had been making postings on a web log that may have influenced the defendant's case. The court then asked: (1) whether there was any discussion by the jurors about the case before deliberations began; (2) whether each juror understood the burden of proof and presumption of innocence; (3) whether there was any discussion of the shootings in Atlanta as they might possibly relate to this case; and (4) whether there was any reference to the Supreme Court's decision regarding the death penalty for juveniles. All of the jurors indicated that there had been no discussion of this case prior to deliberation. All of the jurors indicated their understanding of the State's burden of proof. All jurors except Juror 13, an alternate, stated that there had been no discussion regarding either the Supreme Court's decision regarding the death penalty for juveniles or the unrelated shootings in Atlanta. Juror 13, however, stated that he vaguely remembered a general discussion regarding the unrelated Atlanta shootings but could recall no specifics.

All jurors except Juror 4 indicated that they understood the presumption of innocence. Juror 4 initially stated that he believed that the jury did not understand this principle because "[the jurors] were wondering why [the defendant] didn't take the stand in defense of himself." Nevertheless, when further questioned, Juror 4 stated that both he and the jury understood the court's instruction that the defendant had no obligation to take the stand. Juror 4 also indicated that he "understood that the obligation to take the stand would be inconsistent with the state's burden of proving guilt." At defense counsel's request, the trial court further questioned Juror 4 in the following manner:

Q: [Juror 4], in the course of the deliberations you said that there were some jurors who may have wondered why the defendant did not take the stand. In terms of the reaching of the verdicts, was there any question that the jury and all the jurors individually understood by the time the verdicts were rendered that the fact that the defendant [did not take] the witness stand should have no impact on their deliberations whatsoever?

A: No.

Q: I just want to make sure I understand what your no means. No what? Let me ask it again, . . . when the jury rendered its verdict . . . did you understand any juror to think that they were . . . making the finding of guilty because the defendant did not take the stand?

A: No.

Q: Okay. All the jurors understood at that point that the defendant had no obligation to take the stand?

A: Yes.

Q: All the jurors at that point understood that the burden of proof is entirely on the state?

A: Yes.

In response to defense counsel's request to broaden its inquiry further, the trial court specifically asked whether Juror 2 was one of the jurors who expressed confusion regarding why the defendant may not have taken the witness stand; Juror 4 answered, "No."

At the conclusion of the individual *voir dire*, the trial court found that Juror 2 was credible and that he and the remaining jurors understood the law regarding the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt. The court was also satisfied that Juror 2 and the remaining jurors followed the court's instructions with respect to these principles, as well as other points of law contained in the instructions. The trial court found that there was no indication that there had been any postings on the blog regarding either the defendant's case or anything that would question Juror 2's impartiality. Furthermore, the trial court granted defense counsel additional time to submit evidence of any postings to the blog; none was forthcoming.

The defendant first argues that the trial court erroneously denied his initial motion to set aside the verdicts despite *prima facie* evidence of

misconduct by Juror 2. He asserts that Juror 2 published derogatory and biased opinions regarding criminal defendants and the judicial process in his blog, which was available to the public and other jurors sitting on the case. He also asserts that Juror 2 failed to answer the trial court's pretrial *voir dire* questions honestly. When considered in conjunction with the cumulative effect of the public information and statements published in his blog, the defendant argues, this constitutes *prima facie* evidence of partiality and misconduct by Juror 2. We disagree.

The decision regarding whether to set aside a jury verdict and grant a new trial lies within the sound discretion of the trial court. *Anderson v. Smith*, 150 N.H. 788, 790 (2004). We will uphold the trial court's decision unless it is an unsustainable exercise of discretion. *Id.* We first address the issues under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only. *Id.*

"It is a fundamental precept of our system of justice that a defendant has the right to be tried by a fair and impartial jury." *Petition of Mello*, 145 N.H. 358, 361 (2000) (quotation omitted); *see* N.H. CONST. pt. I, art. 15. Generally, a juror is presumed to be impartial. *State v. Rideout*, 143 N.H. 363, 365 (1999). When a juror's impartiality is questioned, however, the trial court has a duty to determine whether or not the juror is indifferent. *Id.* This is a fact-specific determination, which we will not reverse absent an unsustainable exercise of discretion or a finding that the decision is against the weight of the evidence. *See id.*

"When a party makes a colorable claim that a jury is biased or tainted by extrinsic contact or communication, the court must undertake an adequate inquiry to determine whether the alleged incident occurred and, if so, whether it was prejudicial." *Id.* (citations omitted). *Voir dire* examination serves to protect the defendant's right to an impartial jury by exposing possible biases, both known and unknown, of jurors. *Cf. State v. VandeBogart*, 136 N.H. 107, 110 (1992) (discussing *voir dire* of potential jurors). "The trial court has broad, though not unlimited, discretion to determine the extent and nature of its inquiry." *Rideout*, 143 N.H. at 365.

In a criminal case, the defendant alleging juror bias generally bears the burden to demonstrate actual prejudice. *Rideout*, 143 N.H. at 366. The following two forms of communications with jurors, however, are presumptively prejudicial: (1) communications between jurors and persons associated with the case about matters unrelated to the case; and (2) unauthorized communications between jurors and others about the case. *Id.* When presumptively prejudicial communication occurs, the State bears the burden of establishing that the communication was harmless. *Id.* We

have previously recognized that the following factors are relevant to determining prejudice: (1) whether the matter pending before the court was discussed; (2) whether the party involved was connected with the case and whether the juror knew of the connection; (3) whether the party involved had a substantial role in the case; (4) whether other jurors became aware of the communication or contact; (5) whether the communication or contact extended over a prolonged period of time; (6) the point in deliberations the communication or contact occurred; and (7) the effect of any pertinent instructions. *Id.*

At the initial chambers conference, the trial court correctly identified the statement regarding "the local riff-raff" as being the most troubling blog entry. The court, however, recognized that varying inferences could be drawn from that statement as well as other blog entries and concluded that the communications, in and of themselves, did not compel vacating the verdicts. We agree. The meaning of the phrase "the local riff-raff" is unclear on its face. What Juror 2 meant when he used that phrase is equally unclear. While this statement would reasonably have a negative connotation, we agree with the trial court that it does not constitute sufficient grounds to set aside the jury verdicts without further inquiry.

■ Furthermore, during the chambers conference, the defendant alleged only that the communication was posted on the Internet and available to the public. In order to be presumptively prejudicial, the communication had to be either: (1) between jurors and persons associated with the case about matters unrelated to the case; or (2) between jurors and others about the case. *See Rideout*, 143 N.H. at 366. Here, the defendant did not allege that any other jurors even knew of Juror 2's blog. Nor does the statement, on its face, reference anything specifically related to the defendant's case. Thus, we cannot conclude that the statement was presumptively prejudicial. Consequently, the defendant had the burden to demonstrate actual prejudice. *See id.* Absent evidence that other jurors were aware of the blog or any of the statements contained therein, we cannot conclude that the blog, on its face, actually prejudiced the defendant. Nor can we conclude, from the record, that Juror 2 failed to answer the trial court's pretrial *voir dire* questions honestly. Accordingly, the trial court's denial of the defendant's first motion to set aside the verdicts was not erroneous.

The defendant next argues that the trial court erred when it failed to set aside the verdicts after conducting *voir dire* of the entire jury panel. He argues that the *voir dire* failed to clarify whether the jurors understood the presumption of innocence and burden of proof.

In *VandeBogart*, we recognized that, "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *VandeBogart*, 136 N.H. at 111 (quotation omitted). By extension, this principle applies to a juror's preconceived or inaccurate understanding regarding the presumption of innocence and proper burden of proof. In this case, we do not dispute that the posted blog statements could reasonably be construed as being derogatory towards criminal defendants. The issue, however, is whether Juror 2 could lay aside this opinion and render a verdict based upon the evidence presented at trial in accordance with the court's instructions as to the law.

The trial court's individual *voir dire* of Juror 2 was comprehensive and thorough. The court found credible Juror 2's explanation that the riff-raff statement was an off-hand remark. It also found that, despite any misapprehensions Juror 2 may have had prior to reporting for jury selection, he understood and followed the court's instructions with respect to the proper burden of proof and the presumption of innocence. The trial court concluded that Juror 2 fairly and impartially reviewed the evidence and applied the law as instructed and was, therefore, qualified to sit on the jury panel. We cannot say that the trial court's findings are against the weight of the evidence.

Moreover, the record supports the trial court's determination that the remaining jurors were not affected by the existence of Juror 2's blog. Each stated that there had been no discussion of the case prior to deliberations, that he or she understood the burden of proof and presumption of innocence as explained in the jury instructions, and that he or she was able to render a fair and impartial verdict based upon the facts presented at trial. Thus, the record supports the conclusion that any brief discussions that may have occurred regarding either the unrelated shooting or the United States Supreme Court decision did not taint the jury panel.

The defendant argues that the trial court's individual *voir dire* of the jury panel was inadequate because the court failed to ask two specific questions that the defendant requested: namely, whether each juror had read or responded to Juror 2's blog while on the panel, and whether the apparent confusion regarding the defendant's failure to testify came from a juror other than Juror 2. With respect to the first question, none of the jurors indicated that he or she had any discussion regarding the defendant's case before deliberations. Furthermore, on two occasions, Juror 2 denied receiving any response to statements posted on his blog that were related to the defendant's case. Thus, based upon the record

before us, there is no indication that further questions on this issue were warranted.

Nor are we persuaded that the trial court erred by not further questioning the jury panel regarding purported discussions about the defendant's failure to testify. We have previously recognized that intra-jury communication is generally regarded as less serious than extrinsic contact. *State v. Bathalon*, 146 N.H. 485, 488 (2001). Unlike *Bathalon*, no comment was made in the instant case regarding the defendant's guilt or innocence before the close of the case. Rather, one juror indicated that, during deliberations, some jurors wondered why the defendant did not take the stand. Through its subsequent *voir dire* of Juror 4, the trial court found Juror 4 and the entire jury panel to be fair and impartial. In light of the trial court's thorough *voir dire*, its decision not to further inquire into this matter did not constitute an unsustainable exercise of discretion. *See id.* (recognizing that courts frequently reject claims of jury taint based upon intra-jury communication).

Next, the defendant argues that, because Juror 2 was disqualified for cause from sitting on a subsequent case, he should have been disqualified from sitting on the defendant's case. That another trial court subsequently disqualified Juror 2 for cause does not mean that the trial court in this case should have also struck Juror 2. In this case, the trial court's ruling regarding Juror 2's impartiality was made after extensive *voir dire*, and the record supports the trial court's decision not to set aside the verdicts.

Finally, the defendant argues that he was deprived of his right to exercise a peremptory challenge due to the late disclosure of Juror 2's blog. The defendant contends that Juror 2 dishonestly remained silent when the trial court asked potential jurors the preliminary *voir dire* questions and failed to disclose either his blog or his "strong feelings" referenced in the blog.

In denying the defendant's motion to set aside the verdict, the trial court reasoned that it "cannot speculate as to whether the defendant would or would not have exercised a peremptory challenge if he had known of [Juror 2's] 'riffraff' posting. It is not the court's function to guess as to the type of information that may be important to a party when exercising a peremptory challenge." Because the defendant did not request *voir dire* inquiry as to whether any juror had ever made public (or Internet) comments inconsistent with the presumption of innocence or the burden of proof, and the court made no such inquiry, the trial court found that Juror 2's silence cannot be construed as a false response. This ruling is

supported by the record before us. Based upon our conclusions stated above, we hold that the trial court's ruling was neither untenable nor unreasonable to the prejudice of the defendant.

The State Constitution provides at least as much protection as the Federal Constitution under these circumstances. *Anderson*, 150 N.H. at 792; *see also United States v. Boylan*, 898 F.2d 230, 258 (1st Cir. 1990), *cert. denied*, 498 U.S. 849 (1990). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

## II. Motions to Dismiss and for Directed Verdicts

The defendant argues the trial court should have dismissed the five aggravated felonious sexual assault charges because the State failed to present a *prima facie* case based upon the language of the indictments. The language in each indictment is identical except for the specific act of sexual penetration described. Each indictment asserted, in pertinent part:

1. STEPHEN GOUPIL, IN CONCERT WITH AND AIDED BY DOUGLAS JENOT, ENGAGED IN SEXUAL PENETRATION WITH ... [the victim], SPECIFICALLY [a particular act].

2. STEPHEN GOUPIL AND/OR DOUGLAS JENOT THREATENED TO USE PHYSICAL VIOLENCE UPON [the victim], BY TELLING HER SHE WOULD BE HARMED OR KILLED IF SHE DID NOT SUBMIT TO THE ACT.

3. [The victim] BELIEVED GOUPIL AND/OR JENOT HAD THE PRESENT ABILITY TO EXECUTE THE THREATS.

4. STEPHEN GOUPIL ACTED KNOWINGLY.

The defendant argues that the indictments required the State to prove beyond a reasonable doubt that he verbally threatened the victim prior to each sexual assault by expressly telling her that she would be harmed or killed if she did not submit. He argues that, although the State presented evidence that the victim was verbally threatened before and while the defendant and Jenot searched her apartment, the State presented no evidence that she was verbally threatened before each separate sexual assault. The defendant points to the victim's testimony that her attackers did not verbally tell her that they would kill her or harm her prior to each separate sexual assault.

"To succeed on a sufficiency of the evidence claim, the defendant must show that, viewing the evidence in the light most favorable to the State, no

rational trier of fact could have found guilt beyond a reasonable doubt. All reasonable inferences derived from the evidence are viewed in the light most favorable to the State." *State v. Grimes*, 152 N.H. 310, 311-12 (2005) (citation omitted).

RSA 632-A:2, I(c) provides:

I. A person is guilty of the felony of aggravated felonious sexual assault if such person engages in sexual penetration with another person under any of the following circumstances:

. . . .

(c) When the actor coerces the victim to submit by threatening to use physical violence or superior physical strength on the victim, and the victim believes that the actor has the present ability to execute these threats.

Although this issue is one of first impression, our decision in *State v. Kulikowski*, 132 N.H. 281 (1989), is instructive. In *Kulikowski*, the defendant was found guilty of, among other things, three counts of aggravated felonious sexual assault based upon indictments that alleged a violation of a prior version of the statute here at issue, RSA 632-A:2, III, which required proof that the defendant "coerce[d] the victim to submit by threatening to use physical violence or superior physical strength on the victim, and the victim believe[d] that the actor ha[d] the present ability to execute these threats." *Kulikowski*, 132 N.H. at 285. In substance, the indictments in *Kulikowski* alleged that the defendant coerced his victim into submitting to a sexual act by repeatedly threatening her with physical violence or superior physical strength on numerous previous occasions, some of which occurred more than six years prior to the warrant for the defendant's arrest. *Id.* at 286. In that case, the defendant challenged the sufficiency of the indictments, arguing that they failed to allege the element of coercion by present threats. *Id.* at 285. While we acknowledged that the threat and the act of sexual penetration must be close in time, we ruled that threats against the victim may be implicit and may arise from earlier incidents. *Id.* Thus, we concluded that the indictments were sufficient because they alleged present coercion occasioned by repeated prior threats. *Id.*

Similar to our decision in *Kulikowski*, we conclude that there need not be an overt, express verbal threat prior to each separate act in order to satisfy the requirements of RSA 632-A:2, I(c) or the language of the indictments. As detailed above, the victim testified that her attackers

repeatedly punched her face, head, neck and back, placed a knife to her neck, and threatened to kill her. She testified that, once she stopped screaming, she was told not to move or scream, "or I'm going to cut you up." While the assailants initially searched the apartment, the victim was left blindfolded in the bedroom. When they returned, the assailant with the tattoo exerted physical force over the victim by sitting on her and ripping her clothes off. The victim testified that, while lying on the bed naked and blindfolded, she was afraid to fight back because "[the assailant] made it very clear if I moved, if I resisted, if I screamed, I would . . . die, I would get cut. So I didn't fight back."

The victim's testimony demonstrates that the threat of force and bodily injury was implicit and ongoing throughout the sexual assaults. There was no break in time between the assailants' initial entry and physical attack and the subsequent sexual assaults. Nor was there any significant break in time between the different sexual assaults. Although the assailant with the tattoo did not verbally tell her that he was going to kill her, use the knife on her, or beat her before each separate sexual assault, he did tell her repeatedly during the initial search of the apartment and after making her lie down on the bed that he would hurt her if she did not comply. We conclude, therefore, that the initial repeated verbal threats, along with the actual physical assaults and threats with the knife, constituted an implicit threat throughout the entire ordeal. We decline the defendant's invitation to interpret RSA 632-A:2, I(c) to require proof of a separate express verbal threat immediately before each separate sexual assault. We also decline the defendant's invitation to narrowly interpret the indictments as alleging an express verbal threat prior to each sexual assault. The threats were implied throughout the entire ordeal, *see Kulikowski*, 132 N.H. at 285-86, and the evidence presented at trial, when taken in the light most favorable to the State, supports the trial court's denial of the defendant's motion to dismiss.

We similarly reject the defendant's argument that the trial court should have directed verdicts of acquittal on all five counts of aggravated felonious sexual assault. "In an appeal of the denial of a motion for a directed verdict based on sufficiency of the evidence, the defendant carries the burden of proving that no rational trier of fact, viewing the evidence most favorably to the State, could have found guilt beyond a reasonable doubt." *State v. Surette*, 137 N.H. 20, 22 (1993). Given that this standard is the same as the one applied in reviewing the denial of the motion to dismiss the aggravated felonious sexual assault claims, this argument fails for the reasons given above.

## III. Height Demonstration

The defendant next challenges the denial of his request that he be allowed to stand up in the courtroom and demonstrate his height to the jury. The trial court ruled that the demonstration was inadmissible on relevancy grounds. The defendant argues that the identity of the assailants, and, specifically, the height disparity between them, was a relevant physical characteristic that was admissible at trial.

All evidence must be relevant to be admissible. N.H. R. Ev. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. Relevancy determinations are within the sound discretion of the trial court, and we will not overturn such determinations absent an unsustainable exercise of discretion. *State v. Yates*, 152 N.H. 245, 249 (2005). "To demonstrate that the trial court exercised unsustainable discretion, the defendant must show that the ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.*

At trial, the victim testified that there was a height disparity between the two assailants and that the assailant with the tattoo was shorter than the other. On cross-examination, defense counsel attempted to elicit testimony regarding the specific height of each assailant. The victim, however, consistently described the assailants in terms of their height relative to each other. While the defendant alleges that his height was a fact of consequence in this case, it was of consequence only as it compared to the height of the second assailant, who was not present at trial. Therefore, the trial court reasonably found that having the defendant stand up and demonstrate his actual height to the jury had no tendency to make the existence of the height disparity between the two assailants any more or less probable. Accordingly, we find that the trial court's determination that the height demonstration was inadmissible was neither untenable nor unreasonable.

## IV. Suppression of Statement

The defendant argues that the statements he made during the interview in his grandmother's home on April 23, 2004, should have been suppressed because the police placed him in custody and interrogated him without first notifying him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

■ The police have no obligation to issue *Miranda* warnings when the person being interviewed is not subject to custodial interrogation. *State v. Carroll*, 138 N.H. 687, 696 (1994).

> Whether a defendant is in custody for purposes of *Miranda* is essentially a question of fact, and we will uphold the trial court's finding unless contrary to the manifest weight of the evidence or the result of an error of law. A defendant is in custody if subject to formal arrest or restraint of movement of the degree associated with formal arrest. In the absence of formal arrest, the trial court must consider how much the suspect's freedom of movement was curtailed and how a reasonable person in the suspect's position would have understood the situation. Factors that the trial court should consider include the suspect's familiarity with the surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character.

*Id.* (quotations and citations omitted).

■ After reviewing the record, we uphold the trial court's determination that the police did not conduct a custodial interrogation. Three policemen, two of whom were not in uniform, knocked on the door of the defendant's grandmother's home, asking if they could enter to speak with her grandson. The grandmother consented to the officers' entrance. The police asked the defendant if he wished to speak with them and he agreed. The ensuing interview occurred in the defendant's grandmother's home—surroundings that were both comfortable and familiar to him. He was not physically restrained, and he was clearly free to decline requests from the police, as evidenced by his refusal to allow them to take a DNA swab. When the defendant indicated that he no longer wished to cooperate, the police terminated the interview. The interview did not exceed fifteen minutes. Based upon these facts, we conclude that the trial court's finding that the defendant was not in custody is neither contrary to the manifest weight of the evidence nor the result of an error of law.

*V. Suppression of Photograph*

The defendant argues that the photograph of his tattoo taken during the April 23, 2004 interview was taken in violation of Part I, Article 19 of the New Hampshire Constitution because it was "seized" by the police without a warrant and without his consent.

■ We will assume, without deciding, that photographing the defendant's exposed tattoo constituted a seizure.

> A voluntary consent free of duress and coercion is a recognized exception to the need for both a warrant and probable cause. The burden is on the State to prove, by a preponderance of the evidence, that the consent was free, knowing and voluntary. Voluntariness is a question of fact, based on the totality of the circumstances. We will disturb the trial court's finding of consent only if it is not supported by the record.

*State v. Watson*, 151 N.H. 537, 540 (2004) (citations omitted). The record supports the trial court's findings that the defendant verbally consented to an officer's request to take a photograph of the tattoo, and that he was aware that he was not required to consent to the photograph because, during the same interview, he refused to allow the police to take a DNA swab of his mouth. Further, as stated above, the April 23 interview was not a custodial interrogation. Accordingly, we conclude that the record supports the trial court's finding that the defendant's consent was voluntary.

The defendant additionally argues that the photograph should have been excluded from evidence because its introduction resulted from an unnecessarily suggestive out-of-court procedure and because the victim failed to identify the tattoo. The out-of-court procedure to which the defendant refers occurred on April 27, 2004, when Stiegler showed the victim the photograph of the tattoo. Stiegler did not tell the victim where the picture was taken or to whom the tattoo belonged. Stiegler showed her the photograph by itself, instead of in an array of photographs. Upon seeing the photograph, the victim was unable to say with any certainty that the tattoo shown was the tattoo belonging to one of her assailants.

The defendant and the State agree with the trial court's conclusion that she did not identify the tattoo in the photograph as belonging to her attacker. Accordingly, we need not undertake an analysis of whether the identification procedure was unnecessarily suggestive because no identification took place. What the defendant appeals is not a ruling on a motion to suppress an identification, but, rather, a ruling on the admissibility of the photograph. At trial, the State entered the photograph into evidence during direct examination of Kevin Butler, a detective in the Laconia Police Department, who observed the tattoo on the defendant's arm while processing his arrest. The defendant objected to the introduction of the photograph, stating only, "We would maintain our position, Judge." This vague objection apparently reasserted the defendant's suppression arguments made prior to trial. Our interpretation of the defendant's objection is consistent with the argument made in his brief on appeal.

"We will uphold a trial court's decision to admit evidence absent an unsustainable exercise of discretion. To show that the trial court's decision is not sustainable, the defendant must demonstrate that the ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Lavoie*, 152 N.H. 542, 544 (2005) (citation omitted). Because the defendant does not contest the admissibility of the photograph for any reasons other than those addressed prior to trial in the suppression hearing, which are not relevant to the admissibility of the photograph through this witness, we conclude that he has failed to demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.