Goupil v. NHSP Warden                    07-CV-058-SM  02/26/08
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Stephen Goupil,
        Petitioner

        v.                                  Civil No. 07-cv-58-SM
                                            Opinion No. 2008 DNH 046
Bruce Cattell, Warden,
New Hampshire State Prison for Men,
        Respondent


**O R D E R**


In April of 2004, two men broke into a young woman's apartment, held her at knife-point, and sexually assaulted her repeatedly before stealing her car and fleeing the scene. Petitioner, Stephen Goupil, was subsequently arrested and, when his DNA was compared with DNA in sperm collected from the victim, it was determined to be a match. He was convicted in state superior court of five counts of aggravated felonious sexual assault and one count of theft by unauthorized taking.


Goupil appealed his convictions to the New Hampshire Supreme Court asserting, among other things, that he was deprived of his constitutionally guaranteed right to a fair and impartial jury. State v. Goupil, 154 N.H. 208 (2006). Specifically, Goupil claimed that his criminal trial was tainted because one of the jurors made derogatory comments about criminal defendants in his

personal Web log (known generally as a "blog").  The court rejected Goupil's arguments and affirmed his conviction.

Goupil now seeks federal habeas corpus relief, see 28 U.S.C. § 2254, asserting that the New Hampshire Supreme Court's resolution of his constitutional claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  See Petition for Writ of Habeas Corpus (document no. 1) at 2.  And, although not expressly stated in his petition, it appears Goupil also challenges the state trial court's factual determination that the author of the Web log was not biased and, therefore, that there was no reason to vacate Goupil's convictions on that ground.

Pending before the court is the State's motion for summary judgment on all claims advanced in Goupil's petition.  For the reasons set forth below, the State's motion is granted.

**Standard of Review**

I.   Summary Judgment.

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable

2

to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

II.  Habeas Relief and 28 U.S.C. § 2254.

Since passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), the power to grant federal habeas relief to a state prisoner with respect to claims adjudicated on the merits in state court has been substantially limited. A federal court may not disturb a state conviction unless the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Alternatively, habeas relief may be granted if the state court's resolution of the

issues before it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  See also Williams v. Taylor, 529 U.S. 362, 399 (2000).

With respect to claims brought pursuant to section 2254(d)(1), the United States Supreme Court has explained the distinction between decisions that are "contrary to" clearly established federal law, and those that involve an "unreasonable application" of that law.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.  The Court also noted that an "incorrect" application of federal law is not necessarily an "unreasonable" one.

> The most important point is that an unreasonable application of federal law is different from an incorrect application of federal law . . . . Under §

4

2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 410-11 (emphasis in original).

Finally, it probably bears noting that a state court need not rely upon, nor need it even cite, Supreme Court precedent in order to avoid resolving a petitioner's claims in a way that is "contrary to" or involves an "unreasonable application of" clearly established federal law. See Early v. Packer, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original).

With those principles in mind, the court turns to Goupil's petition.

**Background**

After the jury returned its verdict in Goupil's criminal trial, the court and counsel learned that the foreperson of the jury – Juror 2 – had written comments in his Web log referencing,

5

among other things, his up-coming jury duty.  The New Hampshire Supreme Court described the material facts (which Goupil does not challenge) as follows:

> Prior to jury selection, Juror 2 wrote, "Lucky me, I have Jury Duty! Like my life doesn't already have enough civic participation in it, now I get to listen to the local riff-raff try and convince me of their innocence."  He also made general comments regarding his impression of the jury selection process, his desire not to serve as a juror, and his disgust at possibly being chosen as a juror for an unrelated child pornography case.  Once he was seated on the defendant's jury, but prior to the start of the trial, Juror 2 wrote: "After sitting through 2 days of jury questioning, I was surprised to find that I was not booted due to any strong beliefs I had about police, God, etc."  Prior to trial, Juror 2 also posted: (1) a photograph depicting a woman's deformed face after she was hit by a drunk driver; and (2) a statement containing his views on a United States Supreme Court decision ruling against the death penalty for juveniles.  During the defendant's trial, Juror 2 made a blog entry that referenced an unrelated shooting incident in Atlanta.
>
> The trial court learned of Juror 2's blog soon after the jury returned the verdicts and was released from duty.  The court conducted a chambers conference at which it denied the defendant's first motion to set aside the verdicts, but ruled that further inquiry into Juror 2's blog and its impact, if any, on the remaining jurors was warranted.
>
> The following day, the trial court conducted individual voir dire with each of the jurors, including the alternates.  The court began with Juror 2, who acknowledged having a blog.  The court then asked the following questions:
>
>> Q: Okay.  And on that web log you posted, I guess it was February 9th, something to the effect of now you get to listen to the local riff raff

6

trying to convince me of their innocence.  And I recognize that that was before you were instructed.  Did you understand the instructions that I gave both on a general basis when you first came in and more specifically on this case that the burden of proof is on the state to prove guilt, rather than the defendant to prove innocence?

A: I did, your Honor.

Q: Okay.  Did you follow those instructions in the course of your deliberations?

A: I did, your Honor.

Q: Okay.  Did your feeling before those instructions that it is the responsibility of quote, local riff raff to convince you of [their] innocence, did your feeling there in any way interfere with your ability to follow the instructions with respect to the actual burden being on the state?

A: It did not, your Honor.

Q: Okay.  Your postings also indicated two other areas that I just want to ask you about.  One is you mentioned in your web log certain news articles that you've been following.

First, I want to ask, during the course of this trial from the time-I know you didn't come up to the bench, but at any time did you read - up until the verdict did you read, listen or watch any press coverage of the <u>State v. Goupil</u> case?

A: I did not, your Honor.

Q: Okay.  Your web log mentioned certain coverage with respect to the shootings in Atlanta and certain security concerns raised by that.  Did that in any way interfere with your ability to deliberate this case based on the evidence?

A: Absolutely not, your Honor.

7

Q: Okay.  Your web log also indicated certain reaction to the Supreme Court's opinion with respect to the death penalty for juveniles.  Did that in any way have any impact on your deliberations in this case?

A: Absolutely not, your Honor.

Q: Did you raise any of these issues in terms of the context of this case with any of your colleagues on the jury?

A: Absolutely not, your Honor.

The trial court then consulted with counsel, and defense counsel requested that the court ask Juror 2 additional voir dire questions; the court agreed.  When directly asked what his general knowledge was prior to jury selection with respect to the burden of proof in a criminal case, Juror 2 denied having any predisposition or thoughts on who had the burden of proof.  The trial court then asked, "So what was the genesis of the riff raff?  Convince me of the innocence remark [*sic*]." Juror 2 answered, "Your Honor, I don't even recall making that remark and it was probably an off-hand remark.  There was no real thought behind it."  In response to further questions, Juror 2 stated that he understood the proper burden of proof when he deliberated as a juror on the defendant's case.  He also: (1) denied being exposed to any press coverage regarding this case prior to being drawn as a juror; (2) stated that no one responded to his postings on the web log that related to his jury service on this or any other case; (3) denied receiving any responses to his blog; (4) denied being contacted by anyone trying to influence his decision as a juror; (5) stated that nothing interfered with his ability to follow the jury instructions with respect to the law of the case; and (6) stated that he was absolutely able to make a fair and impartial verdict based upon his evaluation of the evidence in the case as applied to the law given by the trial court.

During its individual voir dire of the remaining jurors, the trial court informed each juror that one of the jurors had been making postings on a web log that

may have influenced the defendant's case. The court then asked: (1) whether there was any discussion by the jurors about the case before deliberations began; (2) whether each juror understood the burden of proof and presumption of innocence; (3) whether there was any discussion of the shootings in Atlanta as they might possibly relate to this case; and (4) whether there was any reference to the Supreme Court's decision regarding the death penalty for juveniles. All of the jurors indicated that there had been no discussion of this case prior to deliberation. All of the jurors indicated their understanding of the State's burden of proof. All jurors except Juror 13, an alternate, stated that there had been no discussion regarding either the Supreme Court's decision regarding the death penalty for juveniles or the unrelated shootings in Atlanta. Juror 13, however, stated that he vaguely remembered a general discussion regarding the unrelated Atlanta shootings but could recall no specifics.

All jurors except Juror 4 indicated that they understood the presumption of innocence. Juror 4 initially stated that he believed that the jury did not understand this principle because "[the jurors] were wondering why [the defendant] didn't take the stand in defense of himself." Nevertheless, when further questioned, Juror 4 stated that both he and the jury understood the court's instruction that the defendant had no obligation to take the stand. Juror 4 also indicated that he "understood that the obligation to take the stand would be inconsistent with the state's burden of proving guilt." At defense counsel's request, the trial court further questioned Juror 4 in the following manner:

> Q: [Juror 4], in the course of the deliberations you said that there were some jurors who may have wondered why the defendant did not take the stand. In terms of the reaching of the verdicts, was there any question that the jury and all the jurors individually understood by the time the verdicts were rendered that the fact that the defendant [did not take] the witness stand should have no impact on their deliberations whatsoever?
>
> A: No.

9

Q: I just want to make sure I understand what your no means. No what? Let me ask it again, ... when the jury rendered its verdict ... did you understand any juror to think that they were ... making the finding of guilty because the defendant did not take the stand?

A: No.

Q: Okay. All the jurors understood at that point that the defendant had no obligation to take the stand?

A: Yes.

Q: All the jurors at that point understood that the burden of proof is entirely on the state?

A: Yes.

In response to defense counsel's request to broaden its inquiry further, the trial court specifically asked whether Juror 2 was one of the jurors who expressed confusion regarding why the defendant may not have taken the witness stand; Juror 4 answered, "No."

At the conclusion of the individual voir dire, the trial court found that Juror 2 was credible and that he and the remaining jurors understood the law regarding the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt. The court was also satisfied that Juror 2 and the remaining jurors followed the court's instructions with respect to these principles, as well as other points of law contained in the instructions. The trial court found that there was no indication that there had been any postings on the blog regarding either the defendant's case or anything that would question Juror 2's impartiality. Furthermore, the trial court granted defense counsel additional time to submit evidence of any postings to the blog; none was forthcoming.

State v. Goupil, 154 N.H. at 214-17.

After discussing the relevant judicial precedent and considering Goupil's arguments, the state supreme court held that the comments made in Juror 2's blog were not presumptively prejudicial and, therefore, Goupil bore the burden of demonstrating that those comments adversely affected his right to a fair and impartial jury. The court then concluded that Goupil failed to demonstrate that Juror 2's conduct caused him to suffer any actual prejudice or that his constitutional rights were violated.

> In order to be presumptively prejudicial, the communication had to be either: (1) between jurors and persons associated with the case about matters unrelated to the case; or (2) between jurors and others about the case. Here, the defendant did not allege that any other jurors even knew of Juror 2's blog. Nor does the statement, on its face, reference anything specifically related to the defendant's case. Thus, we cannot conclude that the statement was presumptively prejudicial. Consequently, the defendant had the burden to demonstrate actual prejudice. Absent evidence that other jurors were aware of the blog or any of the statements contained therein, we cannot conclude that the blog, on its face, actually prejudiced the defendant. Nor can we conclude, from the record, that Juror 2 failed to answer the trial court's pretrial <u>voir</u> <u>dire</u> questions honestly. Accordingly, the trial court's denial of the defendant's first motion to set aside the verdicts was not erroneous.

<u>Id</u>. at 219 (citations omitted).

11

In his petition seeking habeas corpus relief, Goupil asserts that, "[w]hile serving as a member of the jury pool, [Juror 2's] public, opinionated and thus, inappropriate, behavior was prejudicial to Mr. Goupil's defense and rendered him unqualified for jury duty." Petition at 4. He goes on to claim that "due to [Juror 2's] refusal to admit his web publishings prior to trial, [Goupil] was tried by a jury that was not impartial. The trial court erred when it did not set aside the verdict and the Supreme Court erred when it upheld the trial court's decisions. Thus, Mr. Goupil's rights to a fair trial by an impartial jury, as guaranteed by the Sixth, through the Fourteenth, Amendment to the United States Constitution, were violated." Petition at 9-10. It seems, then, that Goupil is challenging the state court's determination that Juror 2 was not biased and was, therefore, qualified to sit as a member of the jury.

Goupil also asserts that Juror 2's blog was an impermissible and prejudicial "extraneous" or "extrinsic" influence on the jury. He also appears to suggest that Juror 2 himself was an improper extrinsic influence on the jury:

> In the case at hand, Mr. Goupil's <u>jury foreman was the extraneous influence</u>. . . . Not only was [Juror 2's] conduct defined as extraneous communications, he, as a jury member and chosen foreman, <u>was an extraneous influence</u>. Once the trial court was aware of his

12

activities, [Juror 2's] conduct was per se inter-jury publications during a felony trial.

Petition at para. 25 (emphasis supplied).

## Discussion

The Sixth Amendment to the Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." Typically, when a criminal defendant alleges that one or more jurors was not impartial, the defendant bears the burden of demonstrating the juror's bias, as well as the prejudice such bias caused the defendant to suffer. See, e.g., Smith v. Phillips, 455 U.S. 209, 215-17 (citing Remmer v. United States, 347 U.S. 227 (1954); Dennis v. United States, 339 U.S. 162 (1950); and Chandler v. Florida, 449 U.S. 560 (1981)).

There are, however, two exceptions to that general rule. A presumption of prejudice arises if a juror communicates (about any topic) with "any person who is associated with the case, or who has an interest in the outcome of the case." United States v. O'Brien, 972 F.2d 12, 14 (1st Cir. 1992). The same is true when a juror speaks with a third party about the case on which the juror is sitting. Id. As the Supreme Court has noted, the

13

"presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  Remmer, 347 U.S. at 229.

I.    Juror 2's Blog and Prejudicial Juror Communications.

In resolving Goupil's constitutional claims, the state supreme court concluded that the comments made by Juror 2 in his blog did not fall into either of the two categories of presumptively prejudicial juror communications.  State v. Goupil, 154 N.H. at 219 (noting that "the defendant did not allege that any other jurors even knew of Juror 2's blog.  Nor does the statement [about the "local riff-raff"], on its face, reference anything specifically related to the defendant's case.").  Accordingly, the court held that Goupil bore the burden of demonstrating that he actually suffered some sort of prejudice as a result of the comments Juror 2 made in his blog.  Id.  And, after reviewing the record of the hearing conducted by the trial court, the state supreme court concluded that Goupil failed to carry that burden.

Goupil challenges that decision, asserting that the state trial court erred when it concluded that the comments made by

14

Juror 2 in his blog were not presumptively prejudicial.  More specifically, he asserts that the state court's decision on that issue was contrary to, or involved an unreasonable application of, Supreme Court precedent on this issue.  The court disagrees.

Goupil's entire argument turns on his assertion that Juror 2's blog constituted inherently prejudicial "extrinsic communications" with a third party about the case on which Juror 2 was sitting.  According to Goupil:

> any public communication by a sitting juror regarding the trial at hand is potentially improper <u>extrinsic communication</u>.  This is all the more so in the present case because the <u>extrinsic communication</u> came from the jury foreman, included the highly prejudicial term "riff raff" in connection with the current case, misstated the burden of proof, and offered an extremely negative perspective on the judicial process in general in a public forum.  Furthermore, the source of the <u>extraneous communication</u>, [Juror 2] himself, was in the jury room in a role that was at least somewhat supervisory.

Petitioner's memorandum (document no. 7) at 3 (emphasis supplied).  It would seem, however, that Goupil is confusing comments made by a juror that might suggest an inherent bias, with "extrinsic communications" made by a juror to a third party about the case on which the juror is currently sitting.  That is to say, Goupil is attempting to characterize Juror 2's comments as something they plainly are not.

15

A Web log or blog is akin to a personal journal or diary, albeit one that the author publishes to the Web and permits others to read.  If Juror 2 had simply written his comments in a diary and not shared those writings with anyone, Goupil surely would not claim that the diary constitutes an "extraneous communication" with third parties of the sort that gives rise to a presumption of prejudice.  The mere fact that Juror 2 chose to makes his journal available to members of the public does not change the situation because, as the trial court specifically found, not only did none of his fellow jurors read his online blog, but none was even aware of its existence.  See State v. Goupil, 154 N.H. at 219 ("defendant did not allege that any other jurors even knew of Juror 2's blog.").  Goupil does not challenge that factual finding.

In support of his position, Goupil relies upon the Supreme Court's opinion in Parker v. Gladden, 385 U.S. 363 (1966).  See Petitioner's memorandum at 2-3 (Goupil also makes passing reference in his memorandum to Brecht v. Abrahamson, 507 U.S. 619 (1993) and, in his petition, to Patterson v. Colorado, 205 U.S. 454 (1907)).  But, none of that Supreme Court precedent stands for the proposition that pre-trial personal opinions of the sort expressed by Juror 2, even if made in a manner accessible to

16

members of the public, are, as a matter of law, presumptively prejudicial to a criminal defendant.

In Parker, the Court addressed a situation in which a court bailiff made comments to at least one juror and one alternate juror indicating that he believed the defendant was a "wicked fellow" and "guilty" of the crimes with which he had been charged. Parker, 385 U.S. at 363-64. Under those circumstances, the Court concluded that the bailiff's comments were inherently prejudicial and violated the defendant's constitutionally protected right to have all "evidence developed against [him] come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, cross-examination, and of counsel." Id. at 364 (citation and internal punctuation omitted). Goupil asserts that "implicit in the holding is [the proposition] that if even one juror was tainted or influenced by extraneous communications, the verdict should be overturned." Petitioner's memorandum (document no. 7) at 3. Even assuming Goupil has accurately understood the implications of the holding in Parker, because none of the other jurors sitting on his criminal case was even aware of Juror 2's blog, plainly none of those jurors was influenced by external

17

statements of the sort the <u>Parker</u> Court concluded were inherently prejudicial.

In short, there is nothing in the record to suggest that Juror 2's blog constituted an impermissible communication with a third party <u>about</u> <u>Goupil's</u> <u>trial</u>. Rather, the content of that blog – the majority of which was written <u>prior</u> to the start of Goupil's trial – does not relate specifically to Goupil's case (the comments posted to the blog during Goupil's trial addressed wholly unrelated matters: a courtroom shooting in Atlanta and the author's selection for jury service on an entirely different case). Instead, the questioned comments in Juror 2's blog amount to little more than a generalized commentary on the criminal process and criminal defendants. And, as noted by the state courts, there is no evidence to suggest that any of the other jurors sitting on Goupil's case were aware of Juror 2's blog.

In light of the foregoing, Juror 2's blog cannot be said to have constituted an "extrinsic" communication with, or influence upon, those members of the jury. It follows, then, that Goupil was not entitled to the <u>Remmer</u> presumption of prejudice. As the court of appeals for this circuit has observed:

18

> Thus, [Supreme Court precedent] requires a fair hearing for nonfrivolous claims of extraneous influence or the like, but does not strictly mandate the use of a rebuttable presumption in every case. Rather, the presumption is applicable only where there is an egregious tampering or third party communication which directly injects itself into the jury process. Put another way, the Remmer standard should be limited to cases of significant ex parte contacts with sitting jurors or those involving aggravated circumstances far beyond what has been shown here.

United States v. Boylan, 898 F.2d 230, 261 (1st Cir. 1990). See also United States v. Bradshaw, 281 F.3d 278 (1st Cir. 2002); United States v. Gomes, 177 F.3d 76 (1st Cir. 1999).

Here, the state trial court conducted a comprehensive post-verdict voir dire of the jurors and afforded Goupil a fair hearing on his claim that Juror 2's blog represented an impermissible extraneous influence on the jury. Goupil has not shown that he was entitled to anything more. More importantly, he has failed to demonstrate that the state court's resolution of the issues he presented was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(2).

19

II.  Juror 2's Personal Biases.

Although Juror 2's pre-trial comments suggest that he might have come to the process with a bias against criminal defendants in general and/or a misunderstanding about the State's burden of proof in criminal cases, still, there is nothing in the record to suggest that he was unable to set aside those (possible) personal biases, listen carefully to the evidence presented at trial, and hold the State to its high burden of proof.  In short, nothing suggests that he failed in any of his duties as a juror.  In fact, the transcripts of the trial court's post-verdict voir dire of Juror 2 demonstrate just the opposite.

A trial court's determination that a juror is capable of setting aside any opinions about the accused and acting in an impartial manner is a question of fact, which, in the context of a habeas petition, is entitled to a presumption of correctness. See, e.g., Patton v. Yount, 467 U.S. 1025, 1036-37 (1984). See also Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) ("In reviewing a habeas corpus petition under AEDPA, a federal court will presume that the state court's findings of fact are correct. For this purpose, the term 'facts' refers to basic, primary, or historical facts, such as witness credibility and recitals of external events.") (citations and internal punctuation omitted).

To be entitled to the habeas relief he seeks, Goupil must rebut that presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

In this case, after conducting an extensive investigation into the matters raised by Goupil, the trial court made the following factual findings with respect to Juror 2:

> I find that [Juror 2] understood the burden of proof [and] that he understood the need to follow the court's instructions, whatever misapprehension he may have been under before he reported for jury selection, with respect to the burden of proof[.] [T]here is no indication that he lacked understanding as to the court's instructions as to what the proper burden of proof was, the presumption of innocence, and the need to follow the court's instructions with respect to that during the course of the trial and in the course of the deliberations. And I don't have any reason to think that he did not fairly and impartially review the evidence.

Trial transcript (document no. 5), Day Seven, at 91. Nothing identified in either Goupil's petition or his legal memorandum is even remotely sufficient to demonstrate, by clear and convincing evidence, that those factual findings were "unreasonable" in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d)(2).

21

## Conclusion

It is not unusual for citizens who are called to jury service to have certain preconceived notions or general social attitudes about crime and criminal defendants. At least some must be credited with understanding that, normally, a neutral and detached magistrate has already concluded that probable cause existed to arrest the defendant and a grand jury has concluded that probable cause exists to charge the defendant with violating the law. In other words, many potential jurors likely understand the criminal justice system and realize that other people have reviewed at least some of the evidence against the defendant and concluded that there is reason to think that he or she committed the crime(s) charged.

Plainly, however, such knowledge and pre-trial opinions do not automatically disqualify a person from serving on a criminal jury. What is important is the ability of jurors to disregard those personal notions, listen attentively to the evidence produced during the trial, maintain an open mind throughout the course of the trial, carefully and faithfully follow the court's instructions on the governing law (including, of course, those on State's burden of proof), deliberate in good faith with the other members of the jury, and base their verdict exclusively on the

evidence admitted at trial, rather than any extrinsic evidence gathered, or personal communications made with non-jurors, during the course of the trial.  As the Supreme Court has observed:

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation.  Were that the rule, few trials would be constitutionally acceptable.  The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Phillips, 455 U.S. at 217.


The fact that Juror 2 might have come to the criminal justice process with preconceived notions about the "local riff-raff" and even a mistaken understanding of which party bears the burden of proof in a criminal trial is, in this case, of little moment.  Nor is the fact that he posted those views in his blog. Upon learning of Juror 2's blog, the trial judge conducted an extensive inquiry into any possible effect it might have had on Goupil's trial.  And, based on the results of that inquiry, the court reasonably and sustainably concluded that: (1) Juror 2's comments did not relate to Goupil's trial; (2) Juror 2 understood

23

the presumption of innocence and the State's burden of proof and applied those concepts in reaching a verdict; (3) none of the other jurors was even aware of Juror 2's blog until after the jury returned its verdict and the court began its investigation; and (4) each juror, including Juror 2, clearly understood that the State bore the burden of proving defendant's guilt beyond a reasonable doubt and defendant had no obligation whatsoever to "prove" his innocence or to take the witness stand.

Given those facts, the trial court sustainably concluded that Juror 2's blog was not the type of "extraneous" or "extrinsic" trial communication by or with a juror that is presumptively prejudicial to a criminal defendant. Accordingly, the court held that Goupil bore the burden of demonstrating actual prejudice. And, when he failed to carry that burden, the court properly denied his motion to vacate his convictions. None of those decisions was contrary to, or involved an unreasonable application of, Supreme Court precedent. Nor were any of the underlying factual findings of the trial court unreasonable in light of the evidence presented to it. Consequently, Goupil is not entitled to habeas relief and the State's motion for summary judgment (document no. 6) is granted.

24

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 26, 2008

cc:  Mark L. Sisti, Esq.
     Ann M. Rice, Esq.
     Stephen Fuller, NHAG's Office
     John Vinson, NH DOC