NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Rockingham
No. 2013-009

THE STATE OF NEW HAMPSHIRE

v.

TIMOTHY MCKENNA

Argued: November 21, 2013
Opinion Issued: September 9, 2014

Joseph A. Foster, attorney general (Elizabeth C. Woodcock, assistant attorney general, on the brief and orally), for the State.

Andrew F. Cotrupi, of Hampton, by brief and orally, and Samdperil & Welsh, PLLC, of Exeter (Richard E. Samdperil on the brief), for the defendant.

BASSETT, J. Following a jury trial in Superior Court (McHugh, J.), the defendant, Timothy McKenna, was convicted of six counts of aggravated felonious sexual assault. RSA 632-A:2 (2007). Prior to trial, the defendant moved to suppress his statements to the police on the ground that he was subject to a custodial interrogation without being informed of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). After an evidentiary hearing, the Superior Court (Delker, J.) denied the motion. The defendant appeals the trial court's denial of his motion to suppress. We reverse and remand.

The following facts are drawn from the trial court's order or from uncontroverted testimony at the pretrial suppression hearing. In October 2010, the Newmarket Police Department received a report that K.L. had been sexually abused by the defendant approximately nine to fourteen years earlier. Lieutenant Kyle True and Sergeant Tara Laurent investigated the allegations and obtained a warrant for the defendant's arrest. On October 22, 2010, True and Laurent, accompanied by New Hampshire State Trooper Rella, drove in two vehicles — one fully-marked State Police cruiser and one unmarked Ford Expedition — to a campground and restaurant owned by the defendant in Errol. The restaurant is located at the end of a one-eighth mile driveway and is not visible from the road. The driveway ends in a large clearing, surrounded by woods, which includes a one-acre field where the parking lot and restaurant are located.

Rella, dressed in his State Police uniform and armed with his service weapon, sought out the defendant to request that he speak to the officers. The Newmarket officers waited outside the restaurant. They wore jackets with the Newmarket police badge and their names embroidered on the front. Although both Newmarket officers were also armed, their jackets covered their weapons. The officers had an arrest warrant in their possession, and it was their intention to arrest the defendant that day, unless the defendant provided the officers information that established that he could not have committed the crime — for example, if the defendant had evidence that he had been outside of the country during the alleged incidents. True testified that he was looking to elicit a confession from the defendant.

Rella and the defendant met with the two officers. True then asked the defendant to speak with him and Laurent without either the defendant's girlfriend or Rella present. True explained that the subject that they intended to discuss was private. He suggested that they sit in the unmarked Ford Expedition because the outside temperature was thirty-five degrees and the officers were not dressed for the outdoors. Laurent testified that the defendant was hesitant, and asked whether they could walk and talk instead. The officers agreed, and the two officers and the defendant began walking. Laurent testified that Rella and the defendant's girlfriend walked in the opposite direction. Rella then returned to his cruiser, which he had parked in a location from which he was able to watch the defendant, True, and Laurent as they walked in the clearing.

The officers began by informing the defendant that they were there to "discuss [him] molesting [K.L.]." The defendant responded by saying that he "did not remember that." Laurent then pulled out a picture of K.L. and showed it to the defendant. The defendant said he remembered her and that she was a "cute girl." Laurent told the defendant that he was not under arrest, and that the officers had come to see him because they wanted to get his side of the story. Laurent noticed that the defendant began to shake when the officers

2

said that they were from Newmarket, and that as they spoke, he looked very nervous and was shaking even harder, so she asked him whether he was cold. The defendant responded that he was not cold, as he had just been working. The interrogation continued.

For approximately one hour and fifteen minutes, the defendant walked to different parts of the clearing, and the officers followed him. They did not allow the defendant to leave Rella's line of sight. At one point, when the defendant began to walk into the woods, True said: "Hold it Tim, we're not walking out there. I don't want to leave the sight of the trooper." Although the defendant did not verbally respond, he stopped walking into the woods and changed direction. The officers continued to follow the defendant and ask questions. When the defendant walked to his truck to get more cigarettes, the officers again followed him. While he sat in the driver's seat of the truck with his feet hanging out of the open door, the officers stood outside the vehicle and continued the questioning.

The two officers and the defendant spoke in a conversational tone. The defendant never unequivocally denied molesting K.L.; however, he denied having an "inappropriate relationship" with her, and repeatedly told the officers that he did not remember molesting K.L. The defendant often responded to the officers with questions of his own about the investigation. On multiple occasions during the interrogation, the officers told the defendant that they did not believe him, urging him to tell the truth. Many of the questions asked by the officers were premised upon the assumption that the defendant was guilty. The officers also posited numerous reasons as to why the defendant might have committed the crime — that he was emotionally attached to K.L., that he was sexually attracted to her, or that he wanted to hurt her. The defendant continued to shake as the interrogation continued. He was chain smoking, and at one point his breathing became shallow.

There is no evidence in the record that before or during the interrogation the defendant was told that he was free to leave the property or informed of his Miranda rights. Nor is there evidence that the officers informed him that he was free to ask them to leave the property, or that he was not required to answer their questions.

After approximately one hour of questioning, Laurent asked whether the defendant had had an emotional relationship with K.L. The defendant denied it. True then said, "You just wanted to come." The defendant nodded his head and responded, "Yes, that was probably it." True then asked if the defendant had had oral sex with K.L. The defendant responded, "Yes." He thereafter made additional incriminating statements. After the defendant made these admissions, the police accompanied him into the restaurant, where he spoke to his girlfriend. Shortly thereafter, he was arrested.

3

Prior to trial, the defendant moved to suppress his statements, arguing that the officers violated his rights under both the New Hampshire and United States Constitutions by subjecting him to a custodial interrogation without informing him of his Miranda rights. Following an evidentiary hearing during which the only witnesses were the two Newmarket officers, the trial court denied the defendant's motion. The court concluded that the defendant was not in custody as he "was familiar with his surroundings, there were only two officers present, and the defendant was not physically restrained." The court stated that the "type of freedom afforded the defendant during the interview bears none of the hallmarks of a formal arrest." After a three-day jury trial, the defendant was convicted of six counts of aggravated felonious sexual assault. This appeal followed.

On appeal, the defendant argues that his rights under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Sixth Amendments to the United States Constitution were violated. Specifically, he contends that the trial court erred in not suppressing his statements because, given that a reasonable person in his position would have believed himself to be in custody, the police should have advised him of his rights under Miranda.

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid in our analysis. State v. Ball, 124 N.H. 226, 231–33 (1983). Before the defendant's responses made during a custodial interrogation may be used as evidence against him, the "State must prove, beyond a reasonable doubt, that it did not violate [his] constitutional rights under Miranda." State v. Gribble, 165 N.H. 1, 10 (2013); cf. State v. Rathbun, 132 N.H. 28, 30 (1989) (ruling State's burden to demonstrate defendant's statement was spontaneous, and thus outside Miranda's ambit, subject to preponderance standard). Compare State v. Lantagne, 165 N.H. ___, ___, 83 A.3d 397, 399 (2013) (explaining State bears burden on motion to suppress), with, e.g., United States v. Davis, 792 F.2d 1299, 1309 (5th Cir. 1986) (stating that the defendant "had the burden of proving that he was under arrest or in custody"). Here, it is undisputed that the defendant was interrogated, and that he did not receive Miranda warnings; accordingly, the sole issue before us is whether that interrogation was custodial.

"Custody entitling a defendant to Miranda protections requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." State v. Jennings, 155 N.H. 768, 772 (2007) (quotation omitted). "In the absence of formal arrest, we must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable person in the suspect's position would have understood the situation." Id. "The location of questioning is not, by itself, determinative: a defendant may be in custody in his own home but not in custody at a police station." Id. (quotation omitted). "To determine whether a reasonable person in the defendant's position would believe himself in custody, the trial court should consider the

totality of the circumstances of the encounter," id. (quotation omitted), "including, but not limited to, factors such as the number of officers present, the degree to which the suspect was physically restrained, the interview's duration and character, and the suspect's familiarity with his surroundings." Id. at 773.

For purposes of appellate review, the trial court's findings of historical facts relevant to the question of custody, that is, its determinations of "what happened," are entitled to the deference we normally accord its factual findings. State v. Ford, 144 N.H. 57, 62 (1999) (quotation omitted). Because the ultimate determination of custody requires an application of a legal standard to historical facts, it is not merely a factual question but a mixed question of law and fact. Id. In a custody analysis, "the crucial question entails an evaluation made after determination of the historical facts: if encountered by a 'reasonable person,' would the identified circumstances add up to custody as defined in Miranda?" Id. at 63 (quoting Thompson v Keohane, 516 U.S. 99, 113 (1995)) (brackets omitted). The trier of fact is not in an appreciably better position than we are to answer that question. Id. Therefore, although we will not overturn the factual findings unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody de novo. Id.

Here, the trial court's findings of historical facts relating to custody are not in dispute: the material facts are based upon the uncontroverted testimony of the two Newmarket officers. Moreover, neither party challenges the trial court's underlying factual findings. Accordingly, in our custody analysis we accept and rely upon the historical facts as set forth in the suppression order.

We begin by observing that our analysis of whether a defendant was in custody during police interrogation is rarely based upon a static set of circumstances. Interrogations are fluid: What may begin as noncustodial questioning may evolve over time into custodial questioning. See, e.g., State v. Dedrick, 132 N.H. 218, 225 (1989), abrogated on other grounds by Ford, 144 N.H. at 62-63 and State v. Spencer, 149 N.H. 622, 625 (2003).

A number of factors must be balanced in determining whether, and at what point, a defendant was in custody during police interrogation. See, e.g., Jennings, 155 N.H. at 772, 773. Here, we first examine the degree to which the officers restrained the defendant's movement. As we observed in Jennings, the lack of handcuffs or similar devices is not dispositive, see id. at 773; indeed, effective restrictions on a defendant's movement can be a product of verbal, psychological, or situational restraint. See United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir.) ("Although not physically bound, [the suspect] was subjected to psychological restraints just as binding."), modified, 830 F.2d 127 (1987). This is so because the "likely effect on a suspect of being

5

placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest." United States v. Griffin, 922 F.2d 1343, 1350-51 (8th Cir. 1990); see id. at 1354 (finding defendant's freedom restrained to degree associated with formal arrest because "he was accompanied by an officer when he retrieved cigarettes from other rooms in [his home] and was told to remain in view of the agents at all times"); cf. United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) (finding no custody when officers escorted defendant outside to smoke a cigarette, but did not limit his movement, and "defendant was not unduly intimidated by the interrogating officers," as shown by his pausing during cigarette break).

In United States v. Mittel-Carey, the First Circuit Court of Appeals concluded that the level of control that the officers exercised over the defendant during the interrogation conducted at the defendant's home carried the most weight in its custody analysis — officers ordered the defendant to dress and go downstairs, told him where to sit, and followed the defendant on the three occasions that he was permitted to move within his home. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007). The court explained that this factor weighed heavily in favor of custody, despite the defendant's familiarity with the surroundings. Id. Here, similarly, the officers accompanied the defendant wherever he walked around his property. True agreed that, from the moment that the officers first spoke with the defendant, True knew that he was not going to allow the defendant to leave his sight. Although True did not verbally disclose his intent to the defendant, his actions — following the defendant everywhere he walked, including when he went to his truck to get more cigarettes — would have conveyed to a reasonable person the reality that the officers did not intend to allow the defendant to leave their sight. See Stansbury v. California, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").

Moreover, the officers also intervened to prevent the defendant from freely moving about his property. When he began walking into the woods, True said, "Hold it Tim, we're not walking out there. I don't want to leave the sight of the trooper." Throughout the interrogation, the officers and the defendant stayed within forty to fifty yards of Rella, and the defendant was aware of Rella's presence. Although the defendant was generally determining the direction of the perambulation, as the trial court found, "the officers did not allow the defendant to enter the woods, or leave Trooper Rella's line-of-sight."

True's testimony that the reason that the defendant was told not to enter the woods was officer safety does not impact our analysis: "[I]t is often the case that suspects are escorted or chaperoned during questioning for reasons unrelated to custody," including for safety reasons, but "the relevant inquiry is the effect on the suspect." Griffin, 922 F.2d at 1350 (quotation omitted).

6

Compare id. at 1354, with United States v. Lifshitz, No. 03 Cr. 572 (LAP), 2004 U.S. Dist. LEXIS 18571, at *21-22 (S.D.N.Y. Sept. 15, 2004) (finding no custody despite restrictions on defendant because agent specifically explained to defendant that restrictions were for safety reasons). In Griffin, the court noted that, although the officers may have escorted the defendant from room to room for safety reasons, that purpose was not disclosed to the defendant, and, therefore, did not influence the analysis. Griffin, 922 F.2d at 1354. Similarly, here, although the officers may have had safety concerns, because those concerns were never communicated to the defendant, they do not influence our analysis of custody.

Custody for Miranda purposes can arise because of a formal arrest or the functional equivalent of arrest; accordingly, the fact that a suspect is not "under arrest" does not preclude a finding of custody. See, e.g., Jennings, 155 N.H. at 772, 775-76 (defendant was in custody despite not being under arrest). Nor is a statement to a suspect that he is not under arrest sufficient, by itself, to establish a lack of custody. Although such a statement generally weighs in favor of a finding of non-custody, see, e.g., United States v. Salvo, 133 F.3d 943, 951 (6th Cir. 1998), it is not dispositive; rather it is but one factor to be weighed in the custody analysis.

Given that informing the defendant that he is not under arrest does not end the custody inquiry, we also consider the fact that there is no evidence that the defendant was informed that he was free to terminate the interrogation. See United States v. Colonna, 511 F.3d 431, 435-36 (4th Cir. 2007) (finding that although the defendant was told that he "was not under arrest," which weighed in favor of a conclusion of no custody, the defendant was in custody, in part because he "was never told that he was free to leave or that he did not have to respond to questions"); see also United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993) ("[T]he extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. . . . Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." (citations omitted)). Indeed, our cases reflect that we have consistently regarded as a significant factor in our custody analysis whether a suspect is informed that he or she is at liberty to terminate the interrogation. See State v. Locke, 149 N.H. 1, 7 (2002) ("Given the repeated advice that he was free to leave, we conclude that a reasonable person in the defendant's position would not believe that he was restrained to the degree associated with formal arrest."); State v. Hammond, 144 N.H. 401, 404 (1999) (finding no custody, based, in part, upon fact that officers informed the defendant several times that he was not under arrest and that he was free to leave at any time); State v. Johnson, 140 N.H. 573, 578 (1995) (finding no custody, in part, based upon fact that trooper informed defendant he was free to leave).

7

Here, the question is whether the restraint on the defendant's movement was akin to a formal arrest. Consequently, whether the defendant was told that he was at liberty to terminate the interrogation provides strong evidence as to whether a reasonable person in the defendant's position would feel free to leave. Thus, notwithstanding the fact that the defendant was told that he was not under arrest, the lack of evidence that he was told he was free to terminate the interrogation supports a finding of custody at some point during the interrogation.

The State relies upon State v. Turmel, 150 N.H. 377 (2003), arguing as follows: In Turmel we found no custody despite concluding that the defendant's movements had been curtailed; in this case, because the defendant's movements were never curtailed, a fortiori, he was not in custody. We disagree.

In Turmel, we distinguished an investigatory traffic stop, during which the police may temporarily seize a suspect for a period no longer than is necessary to confirm or dispel an officer's suspicions of criminal conduct, from the "restraint on freedom of movement of the degree associated with formal arrest" that entitles a suspect to Miranda warnings. Turmel, 150 N.H. at 382-83. We cited Berkemer v. McCarty, 468 U.S. 420 (1984), and observed that during an investigatory traffic stop, a suspect may be temporarily in custody and not free to leave, yet Miranda warnings are not required. Id. at 383. In Berkemer, the Supreme Court explained that temporary custody during an investigatory traffic stop does not require Miranda warnings because the detention of a motorist is presumptively temporary and brief and is typically public. Berkemer, 468 U.S. at 437-38. In Turmel, the defendant was "not detained for an unduly long period of time" and was "being held within the confines of a valid investigatory stop." Turmel, 150 N.H. at 385. We concluded that, at the time that the defendant made the incriminating statement, "immediately after he got out of his car," id., the stop had not "'metamorphosed' into the functional equivalent of arrest for Miranda purposes." Id. at 384-85.

Here, the nature of the defendant's interrogation was qualitatively different from questioning during an investigatory traffic stop; accordingly, the cases relating to traffic stops and allowing temporary custody without Miranda warnings are of limited application. We observe that from the outset of the encounter in this case, the circumstances differed significantly from a typical traffic stop: the officers told the defendant that they had traveled from Newmarket — approximately three hours away by car — to speak to him about a "private" matter. Cf. Berkemer, 468 U.S. at 437 (detained motorist's expectation of interview limited in both time and potential penalty). For more than one hour the defendant was questioned about events that had occurred nine to fourteen years earlier. Unlike in Turmel, where "[t]he officers' purpose was to confirm or dispel the suspicion that the defendant possessed marijuana," Turmel, 150 N.H. at 384, here, the officers were, as True

8

acknowledged, "looking to extract a confession." Cf. id. at 383 (explaining that scope of an investigatory stop "must be carefully tailored to its underlying justification — to confirm or to dispel the officer's particular suspicion"). In short, the circumstances in this case are distinguishable from an investigatory traffic stop. Accordingly, the restraints that the officers placed on the defendant's movement, at least from the point at which the officers did not allow the defendant to enter the woods or leave Rella's line of sight, are a significant factor weighing in favor of an ultimate finding of custody.

We next turn to the character of the interrogation. See Jennings, 155 N.H. at 775 (nature of interrogation is important factor in custody determination). In our analysis, we consider the presence or absence of both accusatory questions and accusatory statements made during questioning. The accusatory nature of questioning is widely recognized as a factor weighing in favor of a finding of police custody. See, e.g., People v. Henry, 980 N.Y.S.2d 594, 596 (App. Div. 2014) (explaining that a factor in custody determination is "whether the questioning was accusatory or investigatory" (quotation omitted)); see also White v. United States, 68 A.3d 271, 281 (D.C. 2013) ("Questions that are inquisitorial in nature are likely to make an encounter with police more coercive."); State v. Dailey, 273 S.W.3d 94, 103 (Tenn. 2009) (weighing in favor of custody that "[t]he character of the questioning was accusatory and demanding, aimed at convincing the Defendant that the police already had sufficient evidence to convict him of murdering the victim and that he had to give them an explanation"). Accusatory questioning often conveys an officer's belief in the defendant's guilt and the officer's intent to arrest. See United States v. Wauneka, 770 F.2d 1434, 1439 (9th Cir. 1985) (concluding defendant was in custody when, inter alia, questioning continued for over an hour and turned accusatory); Ross v. State, 45 So. 3d 403, 415-16 (Fla. 2010) (finding questioning "highly confrontational and accusatorial," and weighing in favor of custody fact that "[t]he detective repeatedly told Ross that he knew Ross committed the crime and the only question remaining was why").

Consistent with this widely accepted approach, we have repeatedly recognized the importance of the absence or presence of accusatory questioning in our analysis of custody, contrasting accusatory questioning, which weighs in favor of custody, with questioning of a purely general nature, which supports a determination of no custody. See State v. Steimel, 155 N.H. 141, 146 (2007) (observing that officer's confronting defendant with suspicions constituted a "relevant factor," but concluding no custody because confrontation "occurred near the end of an otherwise general and casual conversation"); cf. State v. Graca, 142 N.H. 670, 671, 675 (1998) (concluding no custody, in part, when questioning was of a "purely general nature," concerning defendant's identity and reason for being in park); State v. Green, 133 N.H. 249, 258 (1990) (finding no custody, in part because police did not accuse defendant of involvement in crimes for which he was later charged); State v. Tucker, 131 N.H. 526, 529 (1989) (finding no custody, in part, when

9

officer questioned defendant in connection with general investigation of airplane accident and defendant was not focus of investigation). In State v. Dedrick, we upheld the trial court's determination of custody after it "discerned a sea change in the tenor and character of Dedrick's interview," which "would have signaled [to] a reasonable man in the same circumstances that the freedom officers had accorded him earlier was no longer available and that, as often as he made denials, they would renew their accusations until, in the end, he either confessed or asked, as Dedrick in fact did, to speak with an attorney." Dedrick, 132 N.H. at 225. That "sea change" stemmed from the officers' questioning: Where the defendant had previously been "answering general questions about his background and activities," the shift occurred when he was "accused of untruths and confronted with damning information," and, "despite his vehement denials," the officers insisted that he had committed the crime. Id.

Here, as in the latter stages of the Dedrick interrogation, the officers employed accusatory questioning. True acknowledged that the purpose of the questioning was to "extract a confession." The officers agreed at the suppression hearing that their questions were premised upon the assumption that the defendant had committed the crime. On numerous occasions throughout the interrogation the officers asked the defendant why he had sexually abused K.L. and posited reasons for his actions. They asked the defendant if he had a sexual relationship with or molested another child at daycare. Moreover, we find significant that both officers agreed that, during an encounter lasting more than one hour, "the subject matter stayed the same," and "there really wasn't any other conversation, other than regarding [K.L.]." Thus, the accusatory nature of the questioning of the defendant is a significant factor weighing in favor of a finding of custody.

Likewise, accusatory statements made by the officers and directed at the defendant also weigh in favor of custody. See Jennings, 155 N.H. at 774 (weighing in favor of custody that officers repeatedly confronted defendant with their belief that victim was telling truth); Dedrick, 132 N.H. at 225 (weighing in favor of custody that defendant was accused of untruths and confronted with damning information). Although "Miranda warnings are not required simply because the person being questioned is one whom the police suspect," Tucker, 131 N.H. at 529 (quotations omitted), the officers' subjective beliefs as to the defendant's guilt "may become relevant when they are communicated to the defendant and affect an objective determination of whether the defendant would feel free to leave." State v. Muntean, 12 A.3d 518, 528 (Vt. 2010). Thus, confronting the defendant with evidence of guilt weighs in favor of custody: "A reasonable person would not feel at liberty to terminate a police interview after being confronted with such evidence, as a reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime." Id. (quotation omitted); see also Ross, 45 So. 3d at 416-17 (factor that weighed in favor of finding of

10

custody was that defendant was confronted with strong evidence of his guilt); Aguilera-Tovar v. State, 57 A.3d 1084, 1092 (Md. Ct. Spec. App. 2012) ("When a suspect is made aware of the fact . . . that he is a suspect in a case and is not merely being questioned as a witness, that . . . weighs in favor of a finding of custody."); Com. v. Groome, 755 N.E.2d 1224, 1234 (Mass. 2001) (a factor in custody analysis is whether officers have conveyed to person being questioned any belief or opinion that that person is a suspect).

In Jennings, the police officers repeatedly confronted the defendant with his daughter's allegations of sexual assault, telling him that they were certain that the allegations were true. Jennings, 155 N.H. at 774. In concluding that the defendant was in custody, we explained that the control that the police exercised, when combined with the "clear indication that the police believed the defendant to be guilty of sexual assault[,] would have signaled to a reasonable person that his freedom of movement was curtailed to the degree associated with formal arrest." Id.

Here, as in Jennings, the defendant was confronted almost immediately — and throughout the interrogation — with the officers' express statements that they believed him to be guilty of sexual assault. See Dedrick, 132 N.H. at 225 (finding custody when, despite defendant's vehement denials, officers stated time and again that it was defendant who committed the crime). For example, True testified that he began the interrogation by stating, "You know we're here to discuss you molesting [K.L.]," after which Laurent showed the defendant a picture of K.L. and said, "Yeah, this is the girl we're here to discuss you molesting." The officers acknowledged that they had told the defendant "repeatedly, that [they] believed, [that he] had committed aggravated, felonious sexual assault against a child," that they "knew everything . . . about his relationship with [K.L.]," that they knew that he did it and that they believed that it happened. Both officers told the defendant that they did not believe him, and Laurent testified that they admonished the defendant an estimated fifteen times to "tell the truth." The officers' repeated statements to the defendant that they believed that he was guilty weigh in favor of custody.

Our conclusion that the accusatory questioning and statements weigh in favor of custody is not inconsistent with the trial court's findings that "the character of the encounter was not fueled by hostility or animus," and that the officers were polite and did not raise their voices. See, e.g., Dailey, 273 S.W.3d at 103 (concluding defendant was in custody and that questioning was accusatory although the officers' "tone of voice and general demeanor were conversational"). Neither the absence of hostility on the part of the officers, nor the polite tone of the interrogation, neutralizes the content or import of the accusatory questions and statements, nor diminishes the weight which we accord to them. In sum, we find that the accusatory questioning and accusatory statements employed by the interrogating police officers each

11

independently weigh in favor of a finding of custody, and further, that concurrently they strongly support such a finding.

Also relevant to our assessment of the character of the interrogation is the fact that the police initiated the contact with the defendant. When "confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." Griffin, 922 F.2d at 1351; see State v. Hieu Tran, 71 A.3d 1201, 1207 (Vt. 2012); cf. Hammond, 144 N.H. at 404 (finding relevant to no custody determination that defendant drove himself to police station and at end of questioning was allowed to go home); State v. Carroll, 138 N.H. 687, 696-97 (1994) (explaining relevant to no custody finding that defendant requested interview, drove himself to the interview, and on prior day had requested and received permission to leave). Here, not only did the police initiate the contact, but the defendant was aware that the officers traveled from Newmarket to confront him, and they were accompanied by a State Trooper. We find that this factor also weighs in favor of a finding of custody.

We do not mean to suggest that all of the circumstances surrounding the interrogation decisively weigh in favor of a finding of custody; in fact, this is a close case. Some factors, standing alone, weigh against a finding of custody, or are at most neutral considerations. For example, as we discussed earlier, the fact that the defendant was told that he was not under arrest supports a finding of no custody. In regard to the number of officers involved, we agree with the State that, in isolation, the involvement of only two officers in the interrogation would weigh against custody. However, Rella's presence in his marked cruiser during the interrogation contributed to a police-controlled atmosphere, and largely neutralizes this factor.

We recognize that a defendant's familiarity with his surroundings, taken in isolation, often weighs against a finding of custody. See Hughes, 640 F.3d at 435-36. However, as we observed in Jennings, "[t]he location of questioning is not, by itself, determinative: a defendant may be in custody in his own home but not in custody at a police station." Jennings, 155 N.H. at 772 (quotation omitted). We note that other courts have found an interrogation custodial notwithstanding the fact that the defendant was questioned in familiar surroundings. See, e.g., Mittel-Carey, 493 F.3d at 40 ("While an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, . . . the level of physical control the agents exercised over [the defendant] in this case weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home." (citation omitted)); Sprosty v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the defendant] was being held is the degree to which the police dominated the scene."). On balance, here this factor weighs slightly against a finding of custody.

12

Finally, we conclude that the length of the interrogation in this case, approximately one hour and fifteen minutes, weighs neither in favor of, nor against, a finding of custody.  See, e.g., Mittel-Carey, 493 F.3d at 40 (length of interrogation of ninety minutes to two hours supported finding of custody); Jennings, 155 N.H. at 774 ("nearly two hours" of questioning supported conclusion of custody); State v. Goupil, 154 N.H. 208, 226 (2006) (finding no custody when interview lasted less than fifteen minutes); Locke, 149 N.H. at 6 (three and a half hours not excessive and no custody); State v. Dorval, 144 N.H. 455, 456-57 (1999) (interview of three hours "relatively short" and no custody); Johnson, 140 N.H. at 578 (finding no custody, in part, when questioning lasted approximately ten minutes).

The determination as to whether the defendant is in custody for purposes of Miranda requires us to analyze the totality of the circumstances, and not to rely on any single factor in isolation.  See Jennings, 155 N.H. at 772.  "Custody should not be a mystical concept to any law enforcement agency.  We see no reason why doubts as to the presence or absence of custody should not be resolved in favor of providing criminal suspects with the simple expedient of Miranda warnings."  Griffin, 922 F.2d at 1356.  "Effective law enforcement is not frustrated when police inform suspects of their rights."  Id.  "Such practices protect the integrity of the criminal justice system by assuring that convictions obtained by means of confessions do not violate fundamental constitutional principles."  Id.

After considering the "totality of the circumstances of the encounter," Jennings, 155 N.H. at 772 (quotation omitted), and balancing all of the relevant factors, we hold that the defendant was in custody for the purposes of Miranda no later than when the officers prevented him from entering the woods.  We conclude that, at least by that point, a reasonable person in the defendant's position would have understood he was effectively under arrest.  The officers had accompanied the defendant wherever he went on his property, and, when the defendant tried to enter the woods, True instructed him not to do so.  Further, the officers did not allow the defendant to leave the sight of the State Trooper who was monitoring the interrogation from a marked cruiser.  Although the defendant was informed that he was not under arrest, there is no evidence that the officers ever informed the defendant that he was free to terminate the interrogation.  In addition, we accord substantial weight to the fact that the officers' questions were accusatory and focused on the defendant's alleged criminal activity.  For more than an hour, through their use of accusatory statements and questions, the officers repeatedly conveyed their belief in the defendant's guilt.  Accordingly, pursuant to Part I, Article 15 of the New Hampshire Constitution, any incriminating statements made by the defendant after True's instruction not to enter the woods must be suppressed.

At the same time, based on the record before us, we conclude that the defendant was not yet in custody for the purposes of Miranda at the beginning

of the encounter. Accordingly, the defendant's initial responses to the officers that he "did not remember that," and that K.L. was a "cute girl," need not be suppressed.

As to the interrogation that occurred between the defendant's initial responses and True's instruction to him not to enter the woods, the record is unclear regarding the sequence of events — specifically, the interrelationship between the actions and questioning of the police and the statements made by the defendant. Thus, we are unable to determine as a matter of law that the interrogation was noncustodial prior to True's instructions. Accordingly, we remand for the trial court to make specific findings and rulings regarding the admissibility of any incriminating statements made by the defendant after his initial responses, and before True's instruction not to enter the woods.

"Because the defendant prevails under the State Constitution, we need not address his claim under the Federal Constitution." Jennings, 155 N.H. at 776.

Reversed and remanded.

HICKS and CONBOY, JJ., concurred; LYNN, J., with whom DALIANIS, C.J., joined, dissented.

LYNN, J., dissenting. Contrary to the majority, I do not regard this as "a close case." In my view, based on the facts and the law, the defendant clearly was not in custody at any time until the officers placed him under arrest at the end of the interview. As the discussion below demonstrates, the majority does not cite, nor has my research revealed, any case in which an appellate court has overturned a trial court finding that an interrogation was not custodial in factual circumstances that are in any way reasonably analogous to those presented here.

Under well-settled law, although we review de novo a trial court's ultimate legal conclusion as to whether a defendant was in custody when interrogated, we are required to accept the court's underlying factual findings unless they are unsupported by the record or clearly erroneous. See, e.g., State v. Jennings, 155 N.H. 768, 772-73 (2007); State v. Ford, 144 N.H. 57, 62-63 (1999). This deferential standard with respect to underlying fact-finding applies not only to the trial court's resolution of credibility issues, but also to inferences drawn from the circumstantial evidence. As the First Circuit explained in United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011), "when the [trial court] chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to respect." Id. (quotation omitted). Here the majority departs from this rule by subtly recasting the underlying facts in a manner that deviates from the trial court's findings or from inferences that are supported by the record and that we must assume the trial court drew because they support the court's decision. See In

14

the Matter of Aube & Aube, 158 N.H. 459, 466 (2009) ("We must assume that the trial court made subsidiary findings necessary to support its general ruling." (quotation omitted)).  In short, in the guise of conducting de novo review of the trial court's ultimate legal conclusion that the defendant was not in custody, the majority effectively substitutes its judgment for that of the trial court as to the underlying facts.  Because, under the deferential standard of review applicable to the trial court's actual fact-finding, the majority's legal conclusion that the defendant was in custody when interrogated deviates from our prior precedents and is unsupported by any authority, I respectfully dissent.

I

Based upon the evidence presented at the pretrial suppression hearing, the trial court found the pertinent facts to be as follows.  In October 2010, K.L. reported to the Newmarket Police Department that she had been sexually abused by the defendant approximately nine to fourteen years earlier.  At the time of the alleged abuse, the defendant was dating the woman who ran the Newmarket daycare center where the abuse occurred.  At the time the abuse was reported, the defendant resided in Errol at the Bullmoose campground and restaurant, which he also owned and operated.

Lieutenant Kyle True and Sergeant Tara Laurent began investigating the allegations against the defendant and, based upon their investigation, obtained a warrant for his arrest.  On October 22, 2010, True and Laurent met New Hampshire State Trooper Rella in Colebrook and followed him to the Bullmoose to interview the defendant.  Rella drove his fully-marked State Police cruiser, while True and Laurent drove in an unmarked police vehicle.  Upon arriving at the Bullmoose, the officers drove up a long driveway that opened into a large, one-acre clearing where the parking lot and restaurant were located.  The clearing was surrounded by trees.  The officers parked their cars in the lot, and Rella, dressed in his full State Police uniform, which included his visible sidearm, entered the restaurant and spoke to the defendant's girlfriend, who directed Rella to another building where the defendant was working.  The defendant and Rella walked to the parking lot, where True and Laurent were waiting.  True and Laurent each wore a dark jacket with the Newmarket Police badge and their names embroidered on the front, but were otherwise not in uniform and bore no other visible police insignias.  Both officers were armed, but their weapons were covered by their jackets and were not visible.  Rella introduced the defendant to the two Newmarket officers and they all shook hands.

True asked the defendant if he and Laurent could speak to him without his girlfriend (who had approached the officers) or Rella present, as they wanted to discuss a private matter.  True suggested that he, Laurent, and the defendant sit in the Newmarket officers' vehicle, as it was around thirty-five

15

degrees outside and he and Laurent were not dressed for the outdoors.  The defendant, who was dressed for the weather, instead asked whether the three could walk and talk.  The officers agreed, and Rella returned to his cruiser, where he remained for the duration of the interview.

The officers followed the defendant's lead as he began walking around the large open area surrounding the restaurant.  As the three began walking, the officers said they wanted to talk to the defendant about his having molested K.L.  Laurent told the defendant that he was not under arrest — and repeated this statement two or three times throughout the interview — and that the officers just wanted to get his side of the story.  When he was first told why the officers wanted to speak with him, the defendant responded by saying he "did not remember that."  When shown a picture of K.L., however, the defendant smiled, stating that he remembered her and that she was a cute girl.  At this point Laurent noticed that the defendant looked very nervous and was shaking, and she asked him whether he was cold.  The defendant responded that he was not cold, as he had just been working, and the interview continued.

The officers next asked the defendant multiple background questions: they confirmed that he lived in Newmarket at the time the alleged molestation occurred, and that he dated the woman who ran the daycare that K.L. attended during that time period.  When the officers asked the defendant if he had molested other children in Newmarket, the defendant was adamant that he had not.  At this point in the questioning the defendant's breathing became shallow, he continued to shake, and he was chain smoking.

During the conversation, the defendant, accompanied by the officers, walked to different parts of the open field.  At one point the defendant began to walk into the woods.  In response, True said, "Hold it Tim, we're not walking out there.  I don't want to leave the sight of the trooper."  At the suppression hearing, True testified that he did not want to go into the woods because neither he nor Laurent was dressed to walk in the woods, the officers did not know the area, and they did not have any radio communications.  The defendant made no verbal response to True's statement, but simply began walking in another direction.  At another point during the conversation, the defendant ran out of cigarettes.  He walked over to his pickup truck, with the officers following, and retrieved more cigarettes.  Afterward, the defendant sat in the driver's seat of his truck, with his feet hanging out, and the officers stood outside the vehicle, where the three continued the conversation.

The entire conversation with the defendant lasted approximately one hour and fifteen minutes.  During this time, the officers and the defendant walked over different parts of the field, covering most of the open ground.  Throughout the interview, the defendant and the officers spoke back and forth in a conversational tone, and the defendant often took long pauses to think between answers.  Although the defendant never unequivocally denied

molesting K.L., at times he claimed not to remember certain events. The defendant often responded to the officers' questions with questions of his own about the investigation. He asked the officers about the people to whom the police had talked, in what room the abuse was alleged to have occurred, and what evidence the police had. He said that the officers probably had DNA. Sometimes, the officers answered the defendant's questions, and sometimes they declined, telling him that they could not disclose the details of the investigation.

Although the officers told the defendant several times that they did not believe his claims that he could not remember certain things and thought he was not telling the truth, at no point did the officers raise their voices, nor were they confrontational or hostile toward the defendant.

At one point, Laurent asked the defendant if he had an emotional relationship with K.L. The defendant denied this. True then said, "You just wanted to come." The defendant nodded his head and responded, "Yes, that was probably it." True then asked if the defendant had oral sex with K.L., to which the defendant responded, "Yes." The defendant also admitted that he had digitally penetrated K.L. and had vaginal intercourse with her. At this point, the officers told the defendant that it was good to be honest and that they just wanted to hear his version of events. The defendant did not offer any more details, but said that he regretted his relationship with K.L. After the defendant made these admissions, the officers allowed him to go into the restaurant to speak with his girlfriend and get a soda. Although the officers accompanied the defendant into the restaurant, they did not place him under arrest until after they had left the restaurant. The arrest took place out of sight of the restaurant so as not to embarrass the defendant in front of the patrons inside the restaurant.

II

"Custody entitling a person to Miranda protections during interrogation requires formal arrest or restraint on freedom of movement to the degree associated with formal arrest." State v. Steimel, 155 N.H. 141, 144 (2007). The defendant does not contend that he had been formally arrested at the time he was questioned by the officers. That being the case, the trial court was required to determine "whether [the defendant's] freedom of movement was sufficiently curtailed [to constitute the equivalent of arrest] by considering how a reasonable person in [his] position would have understood the situation." Id. Among the factors which are relevant to this determination are the suspect's familiarity with the surroundings where the interrogation occurs, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character. Id.

The trial court determined that the defendant was not in custody and explained its reasoning as follows:

> The defendant was familiar with his surroundings, there were only two officers present, and the defendant was not physically restrained. While the encounter lasted between an hour and an hour and a half, it is clear to the Court that the character of the encounter was not fueled by hostility or animus. Rather, the officers allowed the defendant to wander the field, take time to ponder in silence, and to get cigarettes and sit in his truck. . . . [T]his type of freedom afforded the defendant during the interview bears none of the hallmarks of a formal arrest.

In my view, the trial court's decision was unquestionably correct. In reaching a contrary conclusion, the majority relies upon four factors: (1) the alleged "restraints" placed upon the defendant during the questioning; (2) the fact that the interview was initiated by the police, rather than by the defendant; (3) the fact that, although the defendant was told several times that he was not under arrest, he was not also advised that he was free to terminate the interrogation; and (4) the accusatory nature of the questioning. With respect to the first factor, the majority's determination that the defendant was restrained during questioning is the most obvious example of its substitution of its version of the facts for the contrary factual findings of the trial court. As to the other factors, although there is no doubt that each of them can, in some circumstances, weigh in favor of a finding of custody, in this case these factors are far outweighed by other factors demonstrating that the defendant was not in custody when he was questioned.

A

The majority asserts that "the officers . . . intervened to prevent the defendant from freely moving about his property"; that True agreed that, from the moment he encountered the defendant, True knew that he was not going to allow the defendant to leave his sight; and that although True never conveyed his intent to the defendant, "his actions — following the defendant everywhere he walked, including when he went to his truck to get more cigarettes — would have conveyed to a reasonable person the reality that the officers did not intend to allow the defendant to leave their sight." But this is not a fair description of the nature of the officers' interaction with the defendant. First, when asked if the officers were not going to let the defendant leave their sight, True answered, "I knew that, yes." (Emphasis added.) The clear import of this answer is that this was what the officers intended. However, as the trial court found, there is no evidence that they ever communicated this intent to the defendant — the only fact that matters for custody purposes. See Stansbury v. California, 511 U.S. 318, 323-24 (1994). Furthermore, although the majority emphasizes the point more than once, it also is irrelevant that the officers intended to obtain a

18

confession from the defendant, because this fact too was never communicated to him.

More fundamentally, the majority's description completely ignores the trial court's finding — again, amply supported by the record — that the defendant "willingly and voluntarily spoke to" the officers; as well as the crucial facts that it was the defendant who proposed that he and the officers talk while walking around his property and that he determined where on the property they would go. Given these facts, rather than the "following the defendant everywhere" characterization used by the majority, a more accurate description of what actually occurred is that the defendant led the officers around his property. The same "spin" can be found in the majority's description of the defendant going to his truck to get cigarettes. Although the officers did accompany him to his truck, there is nothing in the record to suggest that in retrieving his cigarettes the defendant was intent upon trying to separate himself from the officers or take a break from the interview.[1] Again, from all that appears in the record, the defendant led the officers to his truck while continuing his conversation with them, and indeed, that is what the trial court found.[2] Given the defendant's suggestion, and the officers' agreement, that the interview be conducted while the trio walked around the defendant's property, it is hard to imagine how else their discussion would have occurred other than by the officers accompanying the defendant.

Here, the interview was conducted in surroundings familiar to the defendant: his own home and business. "[S]uch a location generally presents a less intimidating atmosphere than, say, a police station." Hughes, 640 F.3d at 436; see also United States v. Knowles, 2 F. Supp. 2d 1135, 1144 (E.D. Wis. 1998) (stating that a Customs Office "does not contain the trappings commonly associated with a law enforcement agency, such as uniformed officers milling about or suspects contained in holding cells," supporting the contention that a reasonable person would have felt free to leave); cf. Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) (identifying questioning at a police station as a factor that weighs towards finding custody). Further, the defendant was never

---

[1] The situation might be different if, for example, there was evidence that in seeking to retrieve his cigarettes, the defendant said to the officers something like, "I'm going to get a cigarette, I'll be back in a second." If, despite a statement like this, the officers nonetheless accompanied the defendant while he gathered his cigarettes, such actions arguably would suggest to a reasonable person that he was not free to disentangle himself from the police, even for a moment. See United States v. Cavazos, 668 F.3d 190, 194 (5th Cir. 2012) (noting that the defendant was monitored when he used the telephone and restroom); Jennings, 155 N.H. at 770, 773 (noting that when police told the defendant to "knock on the interview room's door if he needed anything[,] . . . . [t]he implication . . . was that [he] could not leave the room, much less the station"). But see Hughes, 640 F.3d at 436 (finding no custody where agents accompanied the defendant outside when he went for a cigarette during a break in questioning).

[2] There is no evidence, for example, that the officers tried to search the defendant's vehicle for weapons prior to his entering it to get cigarettes. Cf. Jennings, 155 N.H. at 773 (officers conducted pat-down search of defendant before transporting him to police station).

19

enclosed in a small area inside or outside of a building — the interview took place in a large open field, approximately an acre in size. See Hughes, 640 F.3d at 436 (finding no custody, in part, where nothing in the record showed that the officers either "exploited . . . [the] cozy confines [of the defendant's home] or invaded the defendant's personal space"); cf. State v. Dedrick, 132 N.H. 218, 221, 225 (1989) (finding custody, in part, based upon the nature of the interview room, which measured eight feet by eight feet, was windowless, and was lit by a single lamp). That the defendant was very familiar with his surroundings supports the trial court's finding that the interrogation was non-custodial.

Although three officers went to the Bullmoose on October 22, only two actually conducted the interview, while the third remained apart in his vehicle. See Hughes, 640 F.3d at 436 (stating that the presence of four officers was "impressive but not overwhelming," particularly where only two officers questioned the defendant while the others remained apart); see also State v. Turmel, 150 N.H. 377, 379, 385 (2003) (finding no custody where, despite the presence of three police cruisers and an unmarked police truck, only two officers interviewed the defendant); State v. Locke, 149 N.H. 1, 6 (2002) (finding no custody where the defendant was questioned by two officers). Because the number of officers who questioned the defendant was not so numerous as to be inherently intimidating, this factor also supports the trial court's finding of no custody.

At no point during the interview did the officers physically restrain the defendant or otherwise engage in a show of force. The interviewing officers — True and Laurent — were dressed in plain clothes, not police uniforms. Although they were armed, their weapons were covered by their jackets and not visible to the defendant, and at no point did they display or brandish their weapons. See Hughes, 640 F.3d at 436 (finding no custody when, among other factors, the officers did not brandish their weapons, even though they were visible to the defendant); State v. Hammond, 144 N.H. 401, 404 (1999) (finding no custody when, among other factors, the two officers questioning the defendant were not wearing their uniforms and their weapons were not visible to the defendant); Turmel, 150 N.H. at 385 (finding no custody where officers did not display their weapons to the defendant).[3]

_____

[3] The majority asserts that Turmel and other cases involving traffic stops are "of limited application" to the analysis of this case. To the contrary, the significance of Turmel and its progeny is that these cases demonstrate that, even when a person is unquestionably not free to leave (because he has been "seized" during a traffic stop), such level of restriction of freedom is not, without more, enough to require the administration of Miranda warnings before questioning. The seminal question posed by Turmel for the custody question at issue here is this: How likely is it that a motorist, "seized" during a traffic stop, would feel free to roam around his vehicle (or the area where the stop occurs) while being questioned? The answer is obvious; yet legions of cases hold that the mere seizure resulting from a traffic stop does not require administration of Miranda warnings before questioning. Given that the defendant in

The majority seizes upon one isolated incident — True's response to the defendant's mid-interview attempt to walk into the woods — as establishing the point, at the latest, by which the defendant was in custody. But, unlike the "sea change in the tenor and character of [the] interview" that the trial court in Dedrick found occurred after the officers reentered the interrogation room, see Dedrick, 132 N.H. at 225, here there is no evidence that this incident had any effect whatsoever on the tenor or character of the interactions between the officers and the defendant. Although this incident was an occasion when the officers apparently directed the defendant where not to go,[4] such a direction is wholly inadequate to demonstrate custody when considered in light of the totality of circumstances. The First Circuit's decision in Hughes is instructive. There, during an interrogation of the defendant at his home, two troopers accompanied him as he went outside to smoke a cigarette during a break in the questioning. Hughes, 640 F.3d at 436. The court found that "[w]hile escorting a suspect throughout his home may have some bearing on the custody inquiry, there is no evidence that the troopers followed the defendant so closely as to intrude upon any intimate moment or private activity." Id. (citation omitted). Thus, "their foray into the yard, viewed objectively, did not approach the level of physical restraint associated with formal arrest." Id.

The same is true here. When the defendant started to walk into the woods, True said, "Hold it Tim, we're not walking out there. I don't want to leave the sight of the trooper." Neither True nor Laurent made physical contact with the defendant at this point, nor is there evidence that they blocked his path into the woods or otherwise physically redirected his movements in any way. Cf. United States v. Mahmood, 415 F. Supp. 2d 13, 16 (D. Mass. 2006) (when, during interview at defendant's home, telephone rang, agents did not suggest a break or give any indication it was permissible for defendant to answer, and when defendant turned to approach phone, agent placed herself in front of it); Jennings, 155 N.H. at 770 (after requesting defendant to "voluntarily" come to police station, officers rejected defendant's request to travel in his own truck, took keys to the truck, and conducted pat-down search of defendant before he entered police cruiser). In the language of Hughes, the officers did not "intrude upon any intimate moment or private activity," as the defendant at the time was merely endeavoring to steer the collective movement

this case faced nothing remotely resembling the level of restriction on freedom of movement typically imposed on a motorist subject to a traffic stop, the Turmel line of cases strongly supports the conclusion that he was not "in custody" for Miranda purposes.

[4] Although the trial court interpreted Lieutenant True's statement as a direction to the defendant that he could not enter the woods or leave the sight of Trooper Rella, the statement is susceptible of a different interpretation. Taken in context, a plausible alternative interpretation is that when True said, "we're not walking out there" and "I don't want to leave the sight of the trooper," he was referencing only what he (or he and Laurent) intended to do, not what the defendant was compelled to do. Nonetheless, in contrast to the majority's methodology, because the trial court adopted the former interpretation, I accept it for purposes of my analysis.

of the trio into the woods.  Hughes, 640 F.3d at 436; cf. United States v. Madoch, 149 F.3d 596, 601 (7th Cir. 1998) (finding that presence of agent while suspect pumped breast milk in bathroom was sufficient to establish that she was in custody).[5]

Viewed objectively, True's response to the defendant's foray toward the woods did not approach the level of physical restraint associated with formal arrest.  The test for custody is not whether the defendant had absolute freedom to move about as he wished — if that were the test, then police questioning of a motorist during a traffic stop would be unlawful in the absence of Miranda warnings, since the motorist obviously is not free to move about as he wishes.  Rather, the test is whether a reasonable person in the defendant's position would have understood himself to be functionally under arrest.  See Steimel, 155 N.H. at 144.  Not only would a reasonable person not have believed that he was functionally under arrest at that point, but the defendant's own actions clearly illustrate that he did not regard himself as being under arrest or subject to equivalent restraint.  The defendant's response to True's statement was simply to walk in another direction, without comment; he did not stop, ask the officers where he should go, or have any other reaction.  His conduct demonstrates that the defendant believed he retained control over where the trio walked during the interview, and is wholly inconsistent with the thesis that he regarded himself as being in custody.  Nor does the presence of Rella, who merely remained seated in his cruiser some distance away, change the objective reality of this situation.  A reasonable person in the defendant's position, I submit, would think it quite odd that a police officer sitting quietly in a car at varying distances from his location (depending upon where the defendant was at the moment) was exercising dominion and control over him equivalent to that of a person who had been placed under arrest.

To demonstrate the extent to which the majority's "restraint" analysis deviates from the mainstream of settled law, it is useful to compare the facts of this case with those of cases upon which the majority relies to support its conclusion that this factor supports its finding of custody.  The majority cites United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007), in support of its decision, but in fact the circumstances in Mittel-Carey bear little similarity to those here.  In Mittel-Carey, eight FBI agents arrived at the defendant's house

---

[5] The majority acknowledges that police safety concerns can be a valid reason, unrelated to custody, for escorting or placing restrictions on the movement of a person being questioned, but asserts that True's testimony that such concerns were part of what led him to direct the defendant away from walking into the woods need not be considered because the defendant was not informed that this was the reason for the restriction.  Although the defendant may not have been explicitly informed of the reason for not going into the woods, True's statement, "I don't want to leave the sight of the trooper" (emphasis added), combined with the defendant's knowledge that the officers hailed from afar and were unfamiliar with the area, certainly would have communicated to a reasonable person in his position that the officers were concerned for their safety.

at 6:25 a.m. to execute a search warrant for evidence that the defendant possessed and transported child pornography. Two agents entered the defendant's dark bedroom, where he was asleep; one held a flashlight and an unholstered gun. Mittel-Carey, 493 F.3d at 38. By contrast, in the instant case, two plain-clothed police officers and one State Trooper arrived at the defendant's place of business during work hours. Although the officers were armed, their weapons were not visible.

In Mittel-Carey, the agents ordered the defendant to dress and escorted him downstairs from his bedroom. Id. By contrast, in this case, the officers asked to speak with the defendant in private and then suggested that they sit in the officers' vehicle. Instead, the defendant requested that they walk and talk. The officers then followed the defendant's lead as he began walking around a large open area surrounding the restaurant. When the defendant ran out of cigarettes, he led the officers to his truck where he retrieved more cigarettes and then sat on the driver's seat.

In Mittel-Carey, the defendant was told, during the interrogation, that "based on what the agents anticipated finding on his computer and what he had already done he was looking at a lot of jail time." Id. (quotation and brackets omitted). By contrast, in the instant case, although the officers told the defendant that they were there to talk with him about molesting the victim, they never communicated to him that they had a warrant for his arrest or threatened him with jail time. Indeed, throughout their interaction, the officers and the defendant spoke back and forth in a conversational tone. The defendant often responded to the officers' questions with questions of his own about the investigation — a circumstance which demonstrates that, far from being cowed by the officers' presence, he had the presence of mind to attempt to determine how much they already knew. Sometimes the officers answered his questions and sometimes they told him that they could not disclose details about their investigation. At no point did the officers raise their voices or otherwise act in a manner that was hostile or confrontational. The defendant was quiet and often took long pauses to think between answers, and the officers responded in kind by allowing him to do so and by speaking in polite tones.

In Mittel-Carey, the defendant received permission from the agents on three occasions to move from his seated position in the living room. Id. On one occasion, he requested to use the bathroom and was allowed to do so, but was required to leave the door partially open so that an agent could monitor him. Id. at 39. In this case, there is no evidence that the defendant ever felt the need to ask the officers for permission before walking to different parts of the open field or before, at one point, going to his truck, retrieving cigarettes, and then sitting down. The only time the officers told the defendant that he could not walk where he pleased was when he began to walk into the woods.

At that point, an officer merely told the defendant that "we're not walking out there" because the officer did not "want to leave the sight of the trooper."

The majority also likens this case to United States v. Colonna, 511 F.3d 431 (4th Cir. 2007). However, in that case, twenty-four FBI agents and a computer forensic technician arrived at the defendant's home at 6:29 a.m. to execute a search warrant for child pornography. Colonna, 511 F.3d at 433. After the defendant's parents and sister allowed the agents into the home, two agents went to his bedroom, kicked open the bedroom door, and, at gunpoint, ordered him to dress and come downstairs. Id. According to the defendant, as he attempted to dress, one agent "slammed him into a door jam causing injuries to his spine." Id. Although the defendant was told that he was not under arrest, he was told twice that lying to a federal agent was a felony. Id. In contrast, nothing remotely approaching this kind of aggressive law enforcement behavior occurred in this case.

In sum, the record before us amply supports the trial court's finding that "the defendant was the one who decided where the interview occur[red] and he was the one who led the officers to different locations on his property." It is fiction to suggest, as the majority does, that this explicit finding can be squared with its conclusion that the defendant was subjected to restraint of a degree amounting to the functional equivalent of arrest.

B

The majority next relies upon the fact that the interrogation here was initiated by the police, rather than by the defendant himself. Although I agree that this is a factor that weighs in favor of a finding of custody, its significance, under the totality of the circumstances, is minimal. Apparently recognizing as much, the majority attempts to "beef up" this factor by observing that "the defendant was aware that the officers traveled from Newmarket [some three hours away] to confront him." Exactly how the majority believes the officers' place of origin or travel time contributes to the custody analysis is unexplained. At best, these considerations might lead a reasonable person to conclude that the officers considered the subject matter of their desired interview with the defendant to be of sufficient importance to justify the trip. I am aware of no authority, however, that suggests the importance which officers attach to a conversation is indicative of custody. In any event, whatever pro-custody value the initiation-of-the-contact factor may have is completely offset by the absence of any evidence of heavy-handed tactics on the part of the officers in securing the defendant's agreement to be interviewed and by the trial court's explicit finding — which the majority does not dispute – that the defendant "willingly and voluntarily spoke to Lieutenant True and Sergeant Laurent."

The majority also places great weight upon the fact that, although the officers told the defendant on two or three occasions that he was not under arrest, they did not also inform him that he was free to terminate the interrogation.[6]  However, while informing a suspect that he is not under arrest may be "less determinative in favor of non-custody," United States v. Sanchez, 676 F.3d 627, 631 (8th Cir. 2012), than informing him that he is free to leave, it is, nonetheless, a factor that weighs in favor of — not against — a finding that the defendant was not in custody, id. (citing United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006), for the premise that, "where interviewer's statement to suspect that she was not under arrest weighed against custody finding, it was less determinative than a statement informing suspect that answers were voluntary and she was free to leave" (emphasis added)).  "[A] statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was in custody."[7] United States v. Swanson, 341 F.3d 524, 530 (6th Cir. 2003) (citation omitted); see also Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (informing a suspect that he is not under arrest is one factor courts frequently consider to show lack of custody); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) (in finding lack of custody, it was "significant" that the suspect was specifically informed by the officers that he was not under arrest); Smith v. Clark, 2013 WL 4409717, at *7 (E.D. Cal. Aug. 15, 2013) ("We think a reasonable person who is told that he is not under arrest would understand that he is not in custody.").

---

[6] Although some courts appear to regard advice to a person that he does not have to answer questions as a factor that weighs in favor of a finding of non-custody, there is reason to question whether this conclusion is justified.  A person subject to police interrogation has no obligation to answer questions whether he is in custody or not.  And because advising a person that he does not have to answer questions is one part of the Miranda warnings, and there is authority for the proposition that administering Miranda warnings is a factor that may lead a person to believe he is under arrest or its functional equivalent, see Caldwell v. State, 41 So. 3d 188, 201 (Fla. 2010) (discussing conflicting views of various courts on this point); State v. Green, 133 N.H. 249, 258 (1990) ("[T]he reading of Miranda warnings may be a factor in deciding whether a person is in custody under some circumstances . . . ."), it is understandable that officers desirous of not creating a custodial atmosphere would think twice before providing such a "Miranda light" warning.

[7] That the officers had already obtained an arrest warrant for the defendant prior to interviewing him is not relevant to our custody determination, as there is no evidence that the defendant was aware of the warrant.  See Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); see also United States v. Reynolds, 762 F.2d 489, 493 (6th Cir. 1985) ("Since the warrants were unknown to defendants, their existence could not have affected how the defendants understood their position, which is the only relevant consideration under Berkemer.").

Although the majority acknowledges that informing a suspect that he is not under arrest weighs in favor of a finding of non-custody, its analysis then turns this factor upside down by concluding that not <u>also</u> informing the defendant he was free to terminate the interrogation "<u>supports</u> a finding of custody at some point during the interrogation." (Emphasis added.) No authority supports such an approach.

D

Finally, the majority relies upon the accusatory nature of the interrogation as support for its determination that the defendant was in custody. It finds "that the accusatory questioning and accusatory statements employed by the interrogating police officers each independently weigh in favor of a finding of custody, and further, that concurrently they strongly support such a finding." This determination cannot be squared with our prior cases.

True and Laurent spoke with the defendant for approximately seventy-five minutes. Ample authority establishes that an interview of this length is not, in itself, sufficient to raise an inference of custody. <u>See</u>, <u>e.g.</u>, <u>Hughes</u>, 640 F.3d at 437 (stating that a ninety-minute interview was of a "relatively short" duration); <u>Locke</u>, 149 N.H. at 6 ("The interview's duration was not excessive: it lasted for three and one-half hours.").

As for the demeanor of their exchange, the trial court found that "the two officers and the defendant spoke back and forth in a conversational tone," despite the intense subject matter being discussed. The officers were neither hostile nor confrontational to the defendant, and never raised their voices. To the contrary, the trial court described the officers as "polite," and determined that "the character of the encounter was not fueled by hostility or animus." Again this aspect of the interrogation is similar to <u>Hughes</u>, in which the court characterized the interview as non-confrontational despite the fact that the defendant was being questioned about taking nude photographs of a minor in his care — a subject matter that is similarly intense and unpleasant, like the alleged sexual assault of K.L. that was the topic of discussion here. <u>See</u> <u>Hughes</u>, 640 F.3d at 431, 437; <u>see</u> <u>also</u> <u>Locke</u>, 149 N.H. at 7 (finding no custody where there was "no evidence of shouting or harsh tones at any time during the interview"); <u>Hammond</u>, 144 N.H. at 404 (finding no custody where the officers never became confrontational at any point in the questioning).

Although the interview was non-confrontational in tone, the officers did accuse the defendant of molesting K.L., told him several times that they did not believe his claims of not remembering certain things, and urged him to tell the truth. However, our cases hold that even periods of <u>aggressive questioning</u> during an otherwise non-confrontational interview are not sufficient to convert the interview into custodial interrogation. <u>See</u>, <u>e.g.</u>, <u>Steimel</u>, 155 N.H. at 146 ("We have previously held that confrontational questioning did not constitute

26

custody where it occurred briefly during an otherwise casual conversation." (citation omitted)). That being the case, it should follow a fortiori that the absence of any aggressive or confrontational questioning is an even stronger indication of non-custody.

Our cases also make clear that police interrogation does not become custodial merely because its focus is upon the defendant's alleged criminal conduct. For example, in State v. Carpentier, we found that the defendant was not in custody even though officers used strong language and loud voices when confronting him about discrepancies between his statements and those of other witnesses. State v. Carpentier, 132 N.H. 123, 127 (1989). We emphasized that "this intense and accusatory questioning lasted less than ten minutes, after [which] the interview again became relatively unconfrontational." Id. (emphasis added). Similarly, in State v. Carroll, the defendant's mother, an off-duty police officer, aggressively questioned the defendant at the police station, with three other officers present in the interview room. State v. Carroll, 138 N.H. 687, 689-90 (1994). Both the defendant's mother and another officer raised their voices at times, and the defendant cried at several points during the interview. Id. at 690. Moreover, two officers present at the interrogation described it as "one of the most emotional and intense interrogations they had ever witnessed." Id. Nonetheless, we found that, under the totality of the circumstances, the interview was non-custodial. Id. at 696.

In an attempt to reconcile its finding that the accusatory nature of the interrogation rendered it custodial as a matter of law with the trial court's contrary factual finding, the majority relies upon State v. Dailey, 273 S.W.3d 94, 103 (Tenn. 2009), for the proposition that questioning can be custodial when it is accusatory notwithstanding that the officers' "tone of voice and general demeanor were conversational." But, once again, the comparison is unpersuasive because Dailey is readily distinguishable from this case. The first and most obvious distinction is that the questioning in Dailey occurred at the police station, in a small interview room wherein the defendant was seated in the back corner diagonally across from the door in front of which one of the two interrogating officers sat. See Dailey, 273 S.W.3d at 97. Unlike this case, in which the police informed the defendant from the outset of the purpose for their visit, the police in Dailey secured the defendant's presence at the station through the ruse that they needed to take a second set of "elimination fingerprints" because the defendant worked at the business where the victim's body was discovered. Id. During the course of the un-warned interview, the officers not only falsely told the defendant that his fingerprints "had been found in a place they shouldn't have been" and suggested that they had other unspecified forensic evidence of his guilt, but — most significantly for present purposes — they told him that "if they went strictly on the evidence, they would have to charge [him] with first degree murder." Id. at 98 (quotations omitted). In contrast, until the very end of the interview, the officers in this case made no statements to the defendant that they could arrest him or that they intended to

do so. Given the circumstances in <u>Dailey</u>, it is not at all surprising that the court found that the defendant was in custody at least at the point when the officer made the "if I go strictly on the evidence" statement. <u>See</u> <u>id</u>. at 104. <u>Dailey</u>, however, offers no support for a similar result in this case.

Thus, although I do not dispute that accusatory statements and expressions of disbelief in a suspect's veracity are factors that cut in favor of custody, we have never held that they alone are sufficient to find that a suspect was in custody — and here, as shown above, there are no other circumstances sufficient to support such a finding. As the United States Supreme Court has explained:

> [A] noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer <u>Miranda</u> warnings to everyone whom they question.

<u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977); <u>see</u> <u>also</u> <u>United States v. Phillip</u>, 948 F.2d 241, 247 (6th Cir. 1991) ("Coercive environments not rising to the level of formal arrest . . . do not constitute custody within the meaning of <u>Miranda</u>." (citation omitted)).

### III

Virtually all of the cases cited by the majority are relied upon only for general propositions of law, such as that custody is more apt to be found in police-initiated as opposed to suspect-initiated encounters, <u>see</u> <u>ante</u> at 12 (citing <u>United States v. Griffin</u>, 922 F.2d 1343, 1351 (8th Cir. 1990)), that the accusatory nature of questioning is a factor that weighs toward a finding of custody, <u>see</u> <u>ante</u> at 9-11 (citing <u>Dedrick</u>, 132 N.H. at 225), and so on. I do not quarrel with these general legal principles. However, what the majority fails to recognize is that many of the cited opinions held that the questioning at issue did <u>not</u> constitute custodial interrogation. <u>See</u> <u>United States v. Salvo</u>, 133 F.3d 943, 953 (6th Cir. 1998); <u>United States v. Lifshitz</u>, 03 Cr. 572 (LAP), 2004 U.S. Dist. LEXIS 18571, at *26 (S.D.N.Y. Sept. 15, 2004); <u>Com. v. Groome</u>, 755 N.E.2d 1224, 1236 (Mass. 2001); <u>Steimel</u>, 155 N.H. at 146; <u>Locke</u>, 149 N.H. at 7; <u>Hammond</u>, 144 N.H. at 404; <u>State v. Graca</u>, 142 N.H. 670, 676 (1998); <u>State v. Johnson</u>, 140 N.H. 573, 579 (1995); <u>Green</u>, 133 N.H. at 258-59; <u>State v. Tucker</u>, 131 N.H. 526, 531 (1989); <u>People v. Henry</u>, 980 N.Y.S.2d 594, 597 (App. Div. 2014).

Above I have detailed the distinctions between this case and a few of the cases relied upon by the majority in which the courts did find custody. However, the reality is that all such cases relied upon by the majority are readily distinguishable from this case,[8] either because they involved station-house interrogation — the core concern that Miranda warnings were designed to ameliorate — or because they involved significantly greater coercive elements than are present here. See United States v. Beraun-Panez, 812 F.2d 578, 579-80 (9th Cir.) (questioning of defendant by two officers occurred out of doors; officers did not tell him he was under arrest nor was he placed in handcuffs; officers accused defendant of starting a fire, falsely told him that witnesses could place him at the scene, demanded to know why he was lying when he denied it, and told him that he could be deported if he "kept lying" or if he was convicted; when a companion, on horseback, approached the scene of the questioning, one of the officers directed him away), modified, 830 F.2d 127 (9th Cir. 1987); United States v. Griffin, 7 F.3d 1512, 1514-15, 1519 (10th Cir. 1993) (defendant was separated from her friend and questioned by single officer in small airport police office; questioning was accusatory; defendant was not told that she could refuse to answer questions, terminate the interview, or leave); Griffin, 922 F.2d at 1346 (defendant was questioned at home; when told agents were investigating bank robbery, the defendant immediately said "the gun wasn't loaded"; agents told the defendant's parents they needed to speak with him privately; the defendant was not informed that he was not under arrest or that he could refuse to answer questions, was told to always remain in view of agents, and was accompanied to another room when getting cigarettes); United States v. Wauneka, 770 F.2d 1434, 1437 (9th Cir. 1985) (eighteen-year-old defendant transported to law enforcement office by two armed officers; questioned first by four or five officers and, after a break during which he broke down crying, by two officers; defendant never offered opportunity to leave, told he had information only the perpetrator would know, that he matched the description of perpetrator, and that he better stop lying); White v. United States, 68 A.3d 271, 274-75 (D.C. 2014) (car stop; defendant was not asked for license or registration, was immediately handcuffed and isolated from young son left in car; not told that he was not under arrest); Aguilera-Tovar v. State, 57 A.3d 1084, 1087-90 (Md. Ct. Spec. App. 2012) (after appellant was administered a polygraph test, he was interrogated in windowless interview room at police station where officers confronted him

---

[8] Even State v. Hieu Tran, 71 A.3d 1201 (Vt. 2012), the case cited by the majority that arguably presents the factual scenario most nearly analogous to that involved here, is distinguishable in important respects, in that the questioning in that case took place within the confines of a police vehicle, the officers did not inform the defendant either that he was free to leave or that he was not under arrest, and one of the officers told the defendant to stop playing with his cell phone during the interview. See id. at 1203-04. In addition, in Hieu Tran, as in our own Dedrick and Jennings cases, the trial court made a finding that "the circumstances of the questioning created a police-dominated atmosphere," id. at 1204, and the appellate court merely upheld that finding. In contrast, here the majority substitutes its judgment for the trial court's express finding that "the interview bears none of the hallmarks of a formal arrest."

repeatedly and persistently with the fact that he failed the polygraph, accused him of lying, and threatened to inform his wife about the negative test results); Ross v. State, 45 So. 3d 403, 415-17 (Fla. 2010) (defendant came to station voluntarily and was questioned in small room; never told he was free to leave; after initial general questioning, interrogation became confrontational and accusatorial and lasted for hours, during which defendant was repeatedly confronted with evidence against him); Jennings, 155 N.H. at 770-71 (officers met the defendant in the driveway of his residence, asked him to "voluntarily" come to station; after he agreed, insisted that he travel to station in police car rather than his own vehicle, confiscated his car keys and conducted pat-down search of his person; questioned the defendant at the station in a small interview room; officer confronted the defendant with allegations and said he believed them to be true; although the defendant was told he was not under arrest and free to leave, there was no evidence he understood this to be true; when officer left interview room, told the defendant to knock on the door if he needed anything); Dedrick, 132 N.H. at 221-22 (the defendant was questioned at police station in small, windowless room; advised of his Miranda rights, accused of untruths, and confronted with damning information); State v. Hieu Tran, 71 A.3d 1201, 1203-04 (Vt. 2012) (questioning occurred in police cruiser outside the defendant's home; the defendant was repeatedly confronted with evidence of guilt, was not told he was not under arrest or free to leave, and told not to play with his cell phone); State v. Muntean, 12 A.3d 518, 520-22 (Vt. 2010) (the defendant was questioned in a small, windowless room at the police station; not told he was free to leave; continuously confronted with evidence of guilt and accused of being untruthful).

Thus none of the cases cited by the majority support the result reached by the majority. Simply put, the majority can point to no case in which a court has found police questioning of a suspect to involve custodial interrogation where the questioning takes place outside as the suspect leads officers on a walk-around of his own property, the suspect is informed he is not under arrest, there are minimal — if any — exertions of physical control over the suspect, and the questioning is not aggressive or hostile. In short, the majority's decision in this case is an outlier in Miranda jurisprudence.

For the above reasons, I respectfully dissent.

DALIANIS, C.J., joins in the dissent.